By the Court. Denio, J.
The question upon which the parties in this case are at issue, is, whether the act of 1854, providing for the designation of a State paper, is limited to the execution of a single contract for that purpose, or whether it admits of successive contracts, as occasion may require. The plaintiffs’ position is, that the power committed to the Secretary and the other State officers, is exhausted when they have entered into one arrangement, according to the act, with the proprietors of one daily paper and have designated it as the State paper; and that, if from any cause there should thereafter be a failure to perform the services contemplated, *425 there would be no means of providing for their continued performance under existing law, nor any remedy for the evil except by the interposition of the Legislature. If this' is the true construction of the statute, the defendants had no warrant for performing the acts attributed to them; and the plaintiffs are entitled to the rights which they claim, and probably to the remedies which the Supreme Court has afforded them.
The question is not perhaps entirely free from difficulty: but upon a careful consideration of the arguments presented at the bar, and mature reflection upon the case, I have come to the conclusion that the act does contemplate a continued authority in the public officers mentioned, to provide for the performance of the services referred to, by repeated contracts, when in the judgment of those officers the public interest requires a new arrangement, upon the expiration of an existing contract, or upon the default of the first contractors to perform the duties which they had undertaken; and I will proceed to state, with all practicable brevity, the considerations which have led me to that conclusion.
It must be conceded that the act does not in terms speak of more than one contract; and it is equally true that there is no language which strictly confines the officers to the making of a single arrangement. They are “ to miter into contract” with the publishers of a daily newspaper, &c. This language is not inconsistent with a requirement, in substance, to provide by contract for the performance of the services in question; though it does not unequivocally suggest that idea. But the case will not, I think, turn upon that verbal peculiarity. If the direction was that they should execute a contract, it would not conclusively follow that their whole duty had been performed with the making of one agreement, though the argument in favor of the plaintiffs’ position would be somewhat stronger than it is under the language actually used. The inquiry would still have to -be made whether there was enough upon the face of the statute, read in its connection with the prior statutes in pari materia, and with the public exigency which called for its enactment, to show that a continued and perma *426 nent agency for the publication of these legal notices and advertisements was intended by the Legislature to be created by the instrumentality of the public officers named in the act. The manner of the enactment is not essentially different from that ordinarily used when the design is to establish in perpetuity an official or administrative agency for carrying on a portion of the public business. Examples to prove this, may be found upon the most cursory examination of the Constitution and statutes of the State. The cases are quite common where the first appointment is alone provided for, and there is no express statement that it is to be repeated, at fixed periods or from time to time as the exigencies of the case may require, yet the permanent nature of the duties, and their connection with the administrative policy of the State, shows that it was not a temporary exigency which was intended to be provided for, but the establishment of a permanent system respecting that portion of the public business.
For example, the Legislature, by the Constitution, was required, at its first session, to provide for the appointment of Commissioners to reform and simplify the practice of the courts, but there was no provision for renewing its members in any event (art. 6, § 24); and yet it is well known that one at least of the Commissioners, who eventually compiled the system contemplated by that provision, was not among those primarily appointed. So also of offices created by statute, the examples cited on the argument of the appointment of State Reporter (Laws 1848, ch. 224, § 1), and of Division, Resident and Assistant Engineers (Laws 1857, ch. 217, § 7), afford illus-_ trafcions of the practice of establishing a perpetual office by a provision for a single appointment, leaving the authority to renew it at the expiration of the official term—or where no term was prescribed, as in the last instance, when there should be a legal occasion for another appointment to keep the office fall—-to he intended from the nature of the case and the character of the services required. The argument in favor of authority to renew and continue the agency is still stronger where it is an unofficial public employment which is established; and *427 I find provisions illustrating this in the former statutes respecting the public printing. By the act on that subject, passed in 1843, there was a section allowing the several executive officers to make contracts for such necessary printing as was authorized by law for their respective departments, at certain prices mentioned in the act, with a printer, or a firm of printers, other than the State printer, or the printer to the Legislature. There was nothing in terms looking to repeated contracts. The plural form was used because there were several departments, each of which would require a contract. (Laws 1843, ch. 4, § 4.) This printing for the executive departments was a permanent service, which was certain to be required so long as the present system of administration remained: and yet, upon the construction claimed by the plaintiffs, if the person first employed by a department after the act took effect, had failed to perform the service from any cause, the arrangement would necessarily have broken down, and further legislation would have been necessary; though it was evident that a permanent provision to supply the printing for the departments by contracts, to be from time to time made by their respective heads, was what was designed. Other illustrations from these statutes will be hereafter noticed.
It is not intended to affirm that these instances are in all respects parallel with the case under consideration; but they serve to illustrate, in a general way, the position that an express provision for repeated appointments, or successive employments, is not absolutely essential to constitute a permanent office or a perpetual agency for the performance of services for the public. Such provisions as those which have been mentioned, and the enactment under immediate consideration, are to be looked upon as the founding or establishment of governmental agencies to carry on the particular portion of the public administration to which they respectively relate; provided we can see that-the subject to be provided for was permanent in its nature, and not merely temporary or occasional.
*428 It then becomes necessary to inquire what was the character, in this particular, of the services which were to be provided for by the enactment under, consideration; and we find that there are a great number of provisions contained in general and permanent laws, requiring the publication of notices or advertisements in the State paper, as a condition to the commencement or the continuation of some legal proceeding between private parties, or to the perfecting of some act of the government or its officers, concerning the political, financial or judicial administration. These enactments are too numerous, and in general too well known, to require a more particular enumeration or a reference to the statutes in which they are contained. .It is not too much to say that with these statutes in existence, the government of the State could not be carried on, and that ordinary justice could not be administered between man and man, if for any considerable period it should be impossible to make the publications, on account of the failure of the arrangements for continuing a State paper.
It was not, therefore, an isolated public enterprise, temporary in its character as regards the time within which it was to be executed (like the preparation of the Code of Procedure), which was in the view of the Legislature; but a permanent and enduring branch of the civil and judicial administration, and one which could not be intermitted or disarranged without great public and private inconvenience and hazard. The answer given on the argument to this'view was, that it was not thence to be inferred that the arrangement must be a permanent one; but, as it was said, the action of the Legislature would always be available to remedy the, evil, if the single contract, which alone the act allowed, should at any time fail to secure the performance of the. service.. This is no doubt true to a qualified extent, but it is equally true in respect to all other statutory arrangements. If a law prove defective or inefficient "it may be amended or repealed, and a new one enacted to meet the difficulty. But this has nothing to do with the construction of an existing law. When we are seeking to ascertain the intention of the law-maker, we are to *429 assume that the statute was designed to be an adequate and final arrangement for the public exigency which called for its enactment.
That exigency in this case was a provision which should secure the continued publication of these legal notices, and we are to intend that the statutory provisions were framed with a view to accomplish that result; and not that a temporary measure was in the consideration of the Legislature, which, when it should fail from its inherent defects, could be supplied by further legislation. The Legislature of 1854 had no power to bind its successors, but it had ample authority to mate such rules for the guidance of the public officers as should secure the end it had in view. It is proper, though scarcely necessary, to add that these considerations have no weight with the court, except upon the question of the interpretation of the act. We disclaim any power to supply a defect in it if one exists. If the language, reasonably construed, fails to carry out what we conceive to have been the general intention of the Legislature, it is a casus omissus, which is irremediable by the courts. But when the question, as in this case, is what the language employed really means, it is important to ascertain from, all legitimate sources what the emergency or public necessity was which led to the enactment, and we are not to pronounce the measure inadequate without a faithful endeavor to accommodate the language to the obvious intention.
I have said that the act was to be regarded as a permanent measure to secure Jhe publication of the legal notices; not temporarily for the life of one man, or of a single firm of business nlen, or the continuance of a particular business enterprise, but as an arrangement which was to exist in perpetuity. It was impressed with the same character of durability with the-statutory system which required such notices to be published. This will be further evident from the consideration of the prior statutes on the subject of the Stpte paper and the public printing.- For many years the State Printer was a public officer, appointed directly by. statute. While that system existed the provision was confessedly temporary. The life of *430 the incumbent was the extreme limit, but the time was liable to be shortened if the State Printer should fail to perform his duties or should for any cause become unacceptable to the Legislature. In 1840, that method was abandoned. A State Printer was appointed by statute, for a term of four years;" but this was to be the last of the statutory appointments, for the same act provided that thereafter the State Printer should be chosen in the same manner as" the Secretary of State, and should hold the office for four years and until another appointment should be made; and there was a provision for supplying any vacancy which should occur when the two Houses were not in session. (Laws 1840, ch. 1.) In 1843 another act was passed on the subject of the public printing. The term of State Printer was reduced to two years, the mode of appointment being the same as under the act of 1840; and the Governor was to appoint when a vacancy occurred in the recess of the Legislature. The duties of the State Printer were restricted to the publication of the State paper: the other public printing being provided for in another way.
The arrangement made by this act was permanent in its character, inasmuch as it did not require any recurrence to the law-making power. Like all statute laws it was liable to be repealed; but while unrepealed it furnished a system by which the purposes for which it was framed were to be accomplished as long as the State government should endure. But though thus permanent in its legal character, it was in fact of short duration; for by an act passed in 1846, it was repealed,- and the office of State Printer was expressly abolished (ch. 24). The same act directed that the contract for printing the legal notices should be awarded to the lowest bidder. This act also proposed to establish a permanent arrangement as well for publishing the legal notices in a newspaper, as for performing the printing for the legislative and executive departments, and did not contemplate, any more than the acts of 1840 and 1843, a recurrence to the Legislature. Its provisions respecting both descriptions of printing will cast some light upon the construction of the existing act. It declared in the first place *431 that all the printing for the Legislature and the State officers should thereafter be done as follows, namely, by the Comptroller and Secretary publishing notices inviting proposals for doing the work for two years; and contracts were to be made with the lowest bidders, which were to continue in force two years. Nothing was said respecting further contracts or what was to be done at the end of two years (§2). This was left altogether to construction. It then provided for the printing of the Session Laws, which were to be contracted for annually to the lowest bidder. Then the 4th section provided for the legal notices thus: “ All notices now required to be published in the State paper by any law of this State, or which may be so required hereafter to be published, shall, after the provisions of this law take effect, be published as follows: ”
It then provided for the issuing of proposals for the publication of the legal notices once a week in a public newspaper printed in Albany, and for awarding the contract to the lowest bidder. The proposals were to be issued “ at the same time and in the same manner as is in this act before provided.” There is nothing whatever in the act which defines the period to be embraced in the contracts for publishing the legal notices, or which in terms looks to a repetition of the advertisement for proposals, or for bids or contracts to be made after the first contract should have expired, or should have failed for any cause to be available. So far as regards all the public printing, except the legal notices, this act remains in force at this time; but the 4th section, relating to the legal notices,, was superseded by the statute of 1854 immediately under consideration.
There being no provision in terms for renewing the contracts for the legislative and official printing, the authority to continue the system after the first two years-, could only be found by the principles of construction, which apply equally to the present case. But by applying those principles, the meaning of the Legislature became perfectly plain. The intention to provide a permanent system was evident. Then the limited time of the first contracts—a feature which, it is true, *432 does not exist in the present case—showed that the intention wotild certainly be disappointed unless the same method of contracting could be repeated. Hence the constructive authority to make new contracts was irresistibly clear. But under the 4th section the difficulty of continuing the publication of the legal notices, if the first contract should expire or be abandoned by the contractor, would be as great and of precisely the same character as in the present case. There was no express authority for more than one contract, and no time was fixed during which that should remain in force. Yet I believe it was never doubted but that the system was a permanent one, in the sense in which I have used that term, namely, that it was to remain until the act should be repealed or altered by the Legislature; and I understand that repeated contracts have been made pursuant to its provisions.
Before considering more particularly the provisions of the existing statute, I wish to refer to the rules of construction applicable to the case. In one of the opinions delivered in the Supreme Court, and in the argument of the plaintiffs’ counsel before us, it is urged, in substance, that the power conferred upon the State officers should be construed strictly; and it is said to be an elementary rule that where power is granted to particular officers by the Legislature, it is to be construed as limited to a single exercise of it, unless the statute in plain terms provide for its exercise on more than a single occasion. If such a general rule of construction prevails at all, and I have been unable to find the evidence of it, I am persuaded that it is limited to private grants or to the grants of the public property, or of franchises for the emolument of individuals or private corporations. The principle which I presume to have been referred to is thus laid down by a judicious writer: “Private acts of Parliament conferring new and extraordinary powers of a special nature upon particular persons affecting the property of individuals, or giving exemption from a general burden attaching by law upon all parties, should receive a strict interpretation. Where particular powers are granted to a company, if they enter upon any man’s *433 land they must clearly show their authority; and if the wordsi of the statute on which they rely are ambiguous every presumption is to be made against the company and in favor of private property.” (Dwarris on Statutes, 648.)
The act in question is not at all of that character. It is a part of the legal arrangements for carrying on the government and providing for the administration of justice among the citizens of the State, and is remedial in its character. In such cases the rule is, that if the words of a statute are not explicit, the sense is to be gathered from the occasion and necessity of the law, the defect in the former law, and the designed remedy. It is to be so construed as most effectually to meet the beneficial end in view, and to prevent a failure of the remedy. It is to be construed liberally, in contradistinction from a merely verbal construction—largely and beneficially—so as to suppress the mischief and advance the remedy. (Dwarris, 562, 614, 632.) It is by no means unusual, as is said in a late case, to extend the enacting words beyond their natural import and effect in order to include cases within the same mischiefs. (2 Younge & Jervis, 196.)
To apply these principles to the case before us: The Legislature, in the act under consideration, has provided such a system for securing the publication of the legal notices as it thought expedient. It has declared that certain public officers shall enter into contract for their publication, in a daily newspaper published at the seat of government. ¡Nothing has been said expressly about repeated contracts, nor is their power in words limited to the making of a single contract. The intention upon that point is not explicitly announced. The act, as we are bound to suppose, from the absence of anything in it to the contrary, is to regulate the subject for all future time. But arrangements in matters of business are necessarily temporary, and liable to many casualties. Contractors are subject to all the accidents which await other men. They may die, or fail in business, or may refuse or be unable to perform their' engagements. The service is one which does not admit of interruption. The officers entrusted with making the con *434 tracts are permanent officers. What then are we to assume that the Legislature intended? In my «opinion their intention was, and the meaning of the act is, that the legal notices shall be published in a daily paper in Albany, under contracts to be made with the State officers as occasion may require.
It has been urged in opposition to this construction that the act contains no provision to the effect that upon any change of contractors, after one contract has been made, the notices then in the course of publication may be legally continued in the paper of the outgoing contractors, or in the new State paper; though it appears that the subject was in the mind of the Legislature, since there is such a provision for the change which was expected immediately to take place. The suggestion is not without weight, for the intermission of these notices for a single week would often be productive of great inconvenience. We should expect in a carefully drawn act that provision for the contingency would be made, and its absence does furnish an apparent argument against the defendants' construction, which requires to be considered. But I think the circumstance is referable to an oversight on the part of the Legislature, rather than to an intention that there should be no change of publishers after the first. Hone of the acts on the subject of the public printing seem to have been drawn with any considerable care. In this act of 1854 there is a marked instance of inattention to this point. It was passed on the 11th April, to take effect on the 3d May following, and it was not to affect any legal notice the publication of which should have been commenced prior to the passage of the act. (§§ 1, 5.) Hence there was a period of three weeks, during which it was impossible to commence the publication of a notice required to be published in the State paper.
A similar oversight occurred in several of the other acts respecting the State printing, passed after the policy of choosing the printer by statute was discontinued. In that of 1840 a State printer was, as we have seen, to be appointed every four years. A new appointment might of course produce a change of State paper, equally with a new contract under the *435 existing act; but there is no provision for continuing the notices in such a case, though there was upon the immediate change made by the appointment, by the act itself, of Mr. Weed in the place of the proprietors of the Albany Argus. The same thing is observable in the act of 1843, which also provided for the periodical appointment of a State printer. The Evening Journal was the existing paper, and notices were allowed to be continued in that, if commenced before a successor to its proprietor should be appointed, but there was no provision for their continuance in case of future changes. By the act of 1846, the printing of the legal notices was to be let by contract to the lowest bidder, and it has been construed, correctly I have no doubt, to provide for successive contracts. The provision for continuing the notices is equivocal, as it provides in terms for their continuance upon the awarding of one contract; but it should probably be construed to authorize it upon subsequent changes.
Another method of resolving the difficulty was suggested by the defendants’ counsel, namely, that under the general direction to publish in the State paper the notices might be continued in the new State paper upon any change of contract which should produce a change of paper. As what we might now say upon that question would not have the force of a precedent, we express no opinion upon it, leaving it to be determined if it shall arise. In the meantime a declaratory act could be passed, if the Legislature should consider it expedient. The absence of a distinct provision, if one is necessary, is sufficiently answered by showing, as has been done, that it was a casus omissus.
Eor is it necessary to determine whether a contract under the existing statute for a definite term of years, or during the pleasure of the appointing power, would best comport with the intentions of the Legislature. The plaintiffs’ contract was limited to four years, which had elapsed when the new contract was made. The right to hold over after the expiration of that time was subject to be terminated by a new contract, *436 and one has been made, so that the plaintiffs have not, in any view of the matter, the rights claimed in the complaint.
We are all of opinion that the judgment of the Supreme Court should be reversed, and that judgment should be given in favor of the defendants on the demurrer.
Ordered accordingly.