# Cases

# THIRD DEPARTMENT

# GENERAL TERM

## December, 1888.

---

## THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. THOMAS C. PLATT, Appellant.

*When the words "residence" and "domicile," in the construction of a statute, are deemed to be identical and synonymous words — section 54 of chapter 358 of 1863, providing for the appointment of commissioners of quarantine, construed.*

An action was brought by the People of the State of New York to remove the defendant from the office of quarantine commissioner of the Metropolitan police district, upon the ground that he was ineligible to that office because he did not reside in that district. The statute providing for the appointment of commissioners of quarantine (sec. 54 of chap. 358 of 1863) reads as follows. "The governor shall nominate, and by and with the advice and consent of the senate, appoint, three discreet persons, citizens of this State, who shall be residents of the Metropolitan police district, as commissioners of quarantine, for the purposes of this act, who shall hold their offices for three years, and until their successors shall be appointed and qualified. He shall, every three years thereafter, and as often as vacancies shall occur by reason of death, resignation, insanity or removal from the said district, appoint, by and with the consent of the senate, citizens, as aforesaid, who shall reside in said district, to fill the places of those commissioners whose terms shall expire or become vacant; and the persons so appointed shall hold their offices for three years, and until their successors shall be appointed and qualified."

The question as to whether or not the defendant resided in the Metropolitan district or in the village of Owego was contested upon the trial, and the judge presiding on the trial charged the jury that "residence" and "domicile" are, in the construction of this statute, identical and synonymous terms.

*Held,* that no error was committed in so charging. (LANDON, J., dissenting.)

The cases bearing upon the question as to the meaning of the words "resident," "domicile" and "inhabitant," collated and considered by LEARNED, P. J

That the object contained in the statute, which was to be construed in this case and in similar statutes, was two-fold: First. To secure the actual presence of the officer in the place within which his duties are to be discharged. Second. To give to each town, city or county, officers selected from its own inhabitants, from those who there have municipal rights and duties, and are there subject to particular burdens, it is a part of the principle of local government and is intended to prevent a person, whose home and place of voting is in one town, city or county, from being made an officer of another, though it does not prevent such an officer from being absent for a time or even having a summer residence. (Per LEARNED, P. J.)

Upon the trial evidence was given showing that the defendant was born in the village of Owego, and always resided there down to 1878; that he sold his family residence in Owego, in the spring of 1878, and never kept house anywhere thereafter. After selling his house he and his wife boarded at a hotel in Owego until September, 1879. He then changed his boarding-house to the city of New York, but retained a room in the Owego hotel, hiring it by the month, until September, 1882, which he occupied on occasional visits. After going to New York he and his wife occupied rooms in a boarding-house until the fall of 1880, when they changed their quarters to the Fifth Avenue Hotel, and had remained there, except during the hot season of each year, ever since. It was while they were boarding at the corner of Fifth avenue and Forty-first street, in the city of New York, that the defendant received the appointment of commissioner of quarantine. The defendant had been, since April, 1879, secretary or president of an express company, in New York, president of a bank in Owego and president of a railroad company having its head-quarters at Auburn; and had also, since October, 1883, been a partner in a manufacturing firm carrying on business at Owego. He had, during all these years up to the time of the trial, sent his laundry work every week to an Owego laundress; and had also, during the same period, nearly every year, whenever he had exercised the right anywhere at local, State and national elections, voted at Owego.

On one occasion, in July, 1880, when he offered to vote at a special election in Owego, called for the purpose of voting money for school purposes, his right to vote being challenged, on the ground that he was not a resident of the village, he took the general oath and voted. About a year later, in September, 1881, he again took an oath before a notary public, in acknowledging the execution of a deed, to the effect that he then resided in the village of Owego.

*Held,* that the court properly denied a motion made by the defendant to direct a verdict in his favor, and that the verdict of the jury finding that the defendant had his residence at Owego should be affirmed.

APPEAL by the defendant from a judgment entered in the office of the clerk of Albany county on January 13, 1888, after a trial at the Albany circuit, in an action in the nature of a *quo warranto,* and removing the defendant from the office of quarantine commis-

sioner of the Metropolitan police district, upon the ground that he was ineligible to the office on the alleged ground of his non-residence in the district.

The statute provides that " the governor shall nominate, and, by and with the advice and consent of the senate, appoint three discreet persons, citizens of this State, who shall be residents of the Metropolitan police district, as commissioners of quarantine for the purposes of this act, who shall hold their offices for three years and until their successors shall be appointed and qualified. He shall every three years thereafter, and as often as vacancies shall occur by reason of death, resignation, insanity or removal from the said district, appoint, by and with the consent of the senate, citizens as aforesaid, who shall reside in the said district, to fill the places of those commissioners whose terms shall expire or become vacant; and the persons so appointed shall hold their offices for three years and until their successors shall be appointed and qualified." (Laws of 1863, chap. 358 § 54.)

The governor in January, 1880, by and with the advice and consent of the senate, appointed the appellant as one of the commissioners of quarantine. Evidence was given upon the trial to the effect that, since 1878, the defendant's actual and daily residence, together with that of his family, has been in the city of New York. The qualifying circumstances affecting his residence are these : The defendant was born in the village of Owego and county of Tioga, and always resided there down to 1878. He sold his family residence in Owego in the spring of 1878, and has never kept house there or anywhere since. After selling his house, he and his wife boarded at a hotel in Owego until September, 1879. He then changed his boarding-house to the city of New York, but retained a room in the Owego hotel, hiring it by the month until September, 1882, which he occupied on occasional visits during that period. After going to New York he and his wife occupied rooms in a boarding-house until the fall of 1880, when they changed their abode to the Fifth Avenue Hotel; and have remained there, except during the hot season of each year, ever since. It was while they were boarding at the corner of Fifth avenue and Forty-first street, in the city of New York, that the defendant received the appointment of commissioner of quarantine. He has been, since April,

1879, secretary or president of an express company in New York, and during the same period president of a bank in Owego, and president of a railroad company having its head-quarters at Auburn. He has also been, since October, 1883, a partner in a manufacturing firm carrying on business at Owego. He has, during all these years to the present time, sent his laundry work every week to an Owego laundress. He also, during the same period, nearly every year, whenever he exercised the right anywhere, at local, State and national elections, voted at Owego.., On one occasion, in July, 1880, about five months after he had qualified as and assumed the office of quarantine commissioner, he offered to vote at a special election in Owego, called for the purpose of voting money for school purposes. His right to vote was challenged on the ground that he was not a resident of the village, and he took the general oath and voted under the challenge. About a year later, in September, 1881, he again made oath before a notary public, in acknowledging the execution of a deed, that he then resided in the village of Owego. Several business papers executed by him recited his residence as in New York. The defendant testified that he had no fixed habitation after he sold his house in Owego; and that he never intended to change or abandon his domicile there. He further testified that he adhered to this view down to the trial, and that during all these years he had intended to retain his domicile in Owego.

Upon these facts the question to be decided was whether the defendant was or was not a resident of the Metropolitan police district, or, in other words, of the city of New York, at the time of his appointment. The trial judge, in various forms of expression, held and instructed the jury that the statute requiring the appointee to be a resident of the Metropolitan police district was not satisfied by his residence in the district unless he was also domiciled there. The jury were instructed that a man may reside in one place and retain his domicile in another; and that if the defendant retained his domicile in Owego, while his residence was in New York, he was not eligible to appointment.

*W. W. MacFarland,* for the appellant.

*Edwin Countryman,* for the respondent.

LEARNED, P. J. :

The statute required the appointment of three persons, citizens of the State, who should be residents of the Metropolitan police district; and, as often as vacancies should occur by reason of removal from the said district, or other causes, the appointment of others to fill the places, who should reside in said district. This provision is but an application of the general policy of the State.

The Constitution (art. 6, § 6) requires justices of the Supreme Court to reside in their respective districts. (1 R. S., m. pp. 101, 102, §§ 10 to 15, and m. p. 345, section 11); require county judges, sheriffs and many other officers to reside in the respective counties, cities and towns in which the duties of their offices are to be performed. Furthermore, by 1 Revised Statutes (p. 122, § 34), every office becomes vacant on the incumbent's ceasing to be an inhabitant of the State or, if the office be local, of the district, county, town or city for which he shall have been chosen or appointed, or within which the duties of his office are required to be discharged. Here we have the word "inhabitant" used as synonymous with "resident;" the former sections requiring the officer to be a "resident," and this section speaking of his ceasing to be an "inhabitant." It is unquestionable that the two words, in this place, are used with the same meaning; and we may notice that in the recent case of *Borland* v. *Boston* (132 Mass., 89), the Supreme Court of that State very carefully considered the meaning of the word "inhabitant" in a statute, and decided that it meant "being domiciled in." In this decision that court, to some extent, overruled some previous decisions, and they further held that the word "inhabitant," for the purpose of taxation, must be used in the same sense as when used in reference to electing and being elected to office. Thus it was fully decided that the word "inhabitant," when used in reference to being elected to office, means having his home in or being domiciled in the place mentioned.

Our Constitution and statutes use the words "reside" and "resident" (and, in the instance cited, the word "inhabitant") to express one of the qualifications for eligibility to office, or the obligation under which many civil officers are under in respect to the place where their duties are to be discharged. The Constitution uses the same word in expressing the qualifications of voters (art. 2, § 1), requiring

the voter, for a certain time, to be a resident of the county and of the election district. And, to prevent any doubt in certain cases, it provides that in those cases a person shall not be deemed to have gained or lost a residence by "presence or absence."

The inquiry, then, must be : What is the meaning of the words "reside" and "residence," when used to express the obligation aforesaid in respect to the place where official duties are to be discharged? This is a different question from that which arises in proceedings by attachment and the like against non-resident debtors. The ground and reason for those proceedings are found in the inability to serve the debtor personally in the State. Therefore, it was said in one case, "whether their absence from the State is permanent or temporary, whether it is voluntary or involuntary, the reason for giving this remedy to the creditor is the same." (*In Matter of Thompson*, 1 Wend., 45; see, also, the cases of *In Matter of Wrigley*, 4 id., 602; S. C., 8 id., 140; and *Frost* v. *Brisbin*, 19 id., 11.) These cases were examined by Surrogate BRADFORD in *Isham* v. *Gibbons* (1 Bradf., 69), and he remarked that they lean to a liberal construction of the law in favor of the creditor. They do not aid us in giving a construction to the statute now in question. "The cases upon this branch of the law are in a most distressing state of confusion and conflict." (Jacob on Domicile, § 49.)

The object of this provision which we are considering in the present case and in similar statutes is two-fold. First. To secure the actual presence of the officer in the place within which his duties are to be discharged. Second. To give to each town, city or county officers selected from its own inhabitants, from those who there have municipal rights and duties, and are there subject to particular burdens. It is a part of the principle of local self-government. It is intended to prevent a person whose home and place of voting is in one town, city or county from being made an officer of another. It does not prevent such an officer from being absent for a time. He might even have (as so many have) a summer residence, yet he would not thereby be held to have ceased to be an inhabitant of the place in which his duties are to be discharged. And, on the other hand, the mere presence (to use the constitutional word) of such an officer in that place, while his home and place of voting were elsewhere, would not make him a resident within the meaning of these statutes.

If, for instance, a person, chosen county judge of county A. had his home and place of voting in county B, it would seem clear that he could not hold the office, although he were actually to spend the whole of his time in county A. One difficulty in this subject is what Surrogate BRADFORD calls "the large capacity of the words under discussion" (*Isham* v. *Gibbons, ut supra*), that is, the different and varying meanings with which the word residence is used. And there is the further difficulty of defining the word residence, when used to describe a man's absolute, unqualified home.

It is owing to the different meanings in which the word "residence" is used that, while some cases may be found in which residence and domicile are said to be synonymous, others may be found where they are contrasted; and such latter are cited by the appellant. Thus the appellant cites the language of Lord WESTBURY in one of the opinions in *Bell* v. *Kennedy* (L. R., 1 Scotch and Div. App., 320), where he says that residence and domicile are two perfectly distinct things. His meaning is explained further on, where he says: "For although residence may be some small *prima facie* proof of domicile, it is by no means to be inferred from the fact of residence that domicile results." It will be seen, then, that Lord WESTBURY only says that one may, in fact, reside for a time in a place other than his domicile. No question was before the court as to the meaning of the word "residence" in a statute. Bell, the deceased, was born in Jamaica, settled and married there, and all his property was there. Finally he determined to leave the island, and he did so, and bought property in Scotland, but he never determined upon any place as a permanent home. The question was whether Scotch law or English (Jamaica) applied as to a certain part of his estate. And it was held that he had not lost his domicile in Jamaica by his residence elsewhere. That one may actually reside for a time in a place other than his legal residence, his voting residence, is undisputed. But nothing in that case throws any light on the meaning of the word "resident" used in a statute.

The case of *Haggart* v. *Morgan* (5 N. Y., 428) was one of an attachment against a non-resident debtor, a class of cases already discussed. *Dupuy* v. *Wurtz* (53 N. Y., 556) was a case as to the validity of the will of personal property; and the question was

whether the testatrix by a residence abroad had changed her domi
cile, which had been in New York. And the court held there was
no evidence that she had intended to adopt any place as a permanent
home or domicile. In the opinion the court say that a change of
residence, without an intention to change the domicile, does not
effect a change of domicile. This case, also, like one above exam
ined, contains no discussion as to the meaning of the words resi-
dence and reside in a statute. It only uses the words to describe
the facts.

The case of *Queen* v. *The Vice Chancellor* (L. R., 7 Q. B., 471), was
on the construction of a statute which required that the members
of the congregation must be "residents," and which declared that
the word "residents" meant those who had resided for twenty-
one weeks within a mile and a half of Carfax. The relator resided
in a parsonage-house nine miles distant, but he had a bed-room and
sitting-room within a mile and a half of Carfax, and during the
year he had repeatedly slept in the bed-room. The court held that
the act required an actual, and not a constructive, residence. Noth-
ing was said about domicile. The case clearly has no application to
the present.

In *Union Hotel Company* v. *Hersee* (79 N. Y., 454), the defend-
ant had subscribed a sum of money on condition that a certain
amount should be subscribed by "citizens of Buffalo." The question
was whether one of the subscribers was such citizen. The court, in
consideration of the objects of the paper, said that it was "imma-
terial whether the subscriber occupied with his family a house
within the limits of the city or outside of them, as long as his place
of business was in Buffalo," etc. This decision plainly gives no
light on the construction of the statute in question.

We have already stated what we think to have been the meaning
of the words "resident" and "inhabitant," in the statutes above
cited. The learned judge on the trial said that residence and dom-
icle are, in the construction of the statute, identical and synonymous
terms; and thus the question on this appeal as to the meaning of the
word resident becomes a question whether it is synonymous with
the word domicile in this statute. The word domicile appears not
to be used in our statutes, though frequently used in legal discussion
and opinions. Without giving any definition of the word, it is

more important to inquire whether it is synonymous with residence in such a statute as the present.

Mr. Jacobs says: "Residence when used in the statutes is generally construed to mean 'domicile.'" "This is especially true with regard to the subjects of voting, eligibility to office, taxation, jurisdiction in divorce, probate and administration, etc. With respect to those subjects there is substantial unanimity in this country in holding statutory residence to mean domicile." (Jacobs on Domicile, § 75.) "It is necessary that a person who is subject to the laws of a State should have some certain fixed place where he may be called upon to perform the duties and obligations which he owes to the State, and where, too, he may enjoy the privileges which the State accords to him." (Id., § 86.) "A change of municipal domicile is a question of act and intention. On the one hand, mere absence from the former place of abode does not destroy domicile there; nor does presence at a place for a temporary purpose fix domicile there." (Id., § 182.)

Decisions are in harmony with these views. In *Silvey* v. *Lindsay* (107 N. Y., 55) the question was as to the plaintiff's right to vote at a particular place. The court says the question is "one of domicile or residence," using the words as synonymous; and showing that the word "residence" in the Constitution means domicile.

In *Crawford* v. *Wilson* (4 Barb., 505) the court say "the terms legal residence or inhabitancy and domicile mean the same thing. By legal residence I mean the place of a man's fixed habitation, where his political rights, such as the elective franchise, are to be exercised." In *People ex rel. James* v. *Surrogate's Court* (36 Hun, 218) the court says "residence has much the same meaning as domicile."

In *Kennedy* v. *Ryall* (67 N. Y., 386) the question was raised as to the right of the surrogate of New York to grant letters of administration; that is, whether the deceased was a resident of the county; and the court remarks that "generally speaking, domicile and residence mean the same thing;" and the opinion continually uses the words as synonymous.

In *Isham* v. *Gibbons* (*ut supra*), in a matter of probate of a will, it was held that "residing out of the State" meant having a domicile

out of the State; and the learned surrogate examines many cases with great acuteness. *Borland* v. *Boston* (*ut supra*) contains a very exhaustive examination of the Massachusetts cases, and concludes that, so far as relates to municipal rights, privileges, powers or duties, the word "inhabitant" signifies precisely the same as one domiciled.

In *Roberts* v. *Cannon* (4 Dev. & Bat., 256) the question was as to the construction of the Constitution, which authorized persons to vote who had been inhabitants of the county for twelve months. The court said: By residence in a county the Constitution intends a domicile in that county. (See, also, *Hannon* v. *Grizzard*, 89 N. C., 115.)

In *Vanderpoel* v. *O'Hanlon* (53 Iowa, 246) the question was on the construction of the Constitution which required a voter to have been a resident of the county sixty days. The court said: "He is entitled to vote only in the county where his home is, where his fixed place of residence is for the time being; and such place is and must be his domicile." A similar meaning is given to the word residence on the question of a right to vote, in *Blanchard* v. *Stearns* (5 Metc., 298, and opinion of judges, Id. 587, supplement). The same construction was given on the question of a person's settlement, in *Abington* v. *North Bridgewater* (23 Pick., 170), and in *Shaw* v. *Shaw* (98 Mass., 158), on the question of jurisdiction in case of divorce. A similar question arose in *Chase* v. *Miller* (41 Penn. St., 403). And the court said: "Undoubtedly the primary signification of the word 'residence,' as used in the Constitution, is the same as domicile." Again, in *Fry's Election Case* (71 Penn. St., 302), on a similar question as to the meaning of the word "resident," in the Constitution, the court gave a very elaborate opinion, spoke of residence as denoting domicile, and said: "The elector must, therefore, vote at home, not only in the State, but in the district where his home is. His domicile must be there." To the same effect is *Dauphin County* v. *Banks* (1 Pearson's Dec. [Penn.], 40).

It seems hardly necessary to add to these authorities. No case has been cited to us where the question as to the meaning of the word residence in a constitution or a statute has arisen, and where the subject was the right to vote or the right to hold office, or the right of probate and succession to personal property, in which the word residence has not been held, without doubt, to be equivalent to

domicile. And, indeed, if this meaning of domicile is not to be given to the word, residence, in statutes upon those subjects, what meaning can be given? Shall residence, which is to give the right to vote, include a merely temporary stay, when the domicile remains elsewhere? And if it does not include a temporary stay, how long a time must elapse (the domicile remaining elsewhere) in order to give one a right to vote? Cases are to be found where the actual residence (to use that expression) has continued for years, and yet the domicile has not been changed. (Jacobs on Dom., § 303 *et seq.*) Hence we cannot depend on the length of time alone; the intention being wanting. And if we cannot depend on the length of time, then, on the right to vote and on similar rights, a short stay (provided it is over four months in the county) would be as effectual as a long stay. There is no other alternative, therefore, in construing the word "residence" in such statutes. It must either mean domicile, or it must include any living or staying in a place, however temporary in character, which is long enough to satisfy the statute. The statute, for instance, gives jurisdiction to the Surrogate's Court of the county of which deceased was a resident. (Code of Civil Procedure, § 2476.) If residence does not mean domicile, then if one domiciled in New York should die while in his summer residence in some other county, jurisdiction would belong to the latter county.

It is true that decisions on the subject have been more generally on the right to vote than on the right to hold office. It is seldom that one, not domiciled in a place, has assumed to hold a local office therein. But certainly the word "residence" must mean the same thing in both cases. It would be absurd to say that more permanency was required in the voter than in the local officer voted for. If, by statute, one must be a resident of a town in order to vote, and by statute, also, one must be a resident of the town to hold office therein, then if residence in the voter's case means domicile, so it means, also, in the case of the officer. The two subjects are cognate, and the word "residence" is used with like meaning in respect to each.

There is a provision in our statutes relative to taxation that "in case any person possessed of such personal property shall reside during any year in which taxes may be levied in two or more counties or towns, his residence, for the purposes and within the meaning of this

section, shall be deemed and held to be in the county and town in which his principal business shall have been transacted." (1 R. S., 389, § 5, as amended by chap. 92 of 1850.) This is a mere provision as to taxation, expressly limited to that subject. It is not an attempt to define the meaning of statutory residence. Its object is manifest. It was to prevent a man who had a house in the country and a house in the city, and whose business was in the city, from choosing to make his country-house the place of domicile, so far as taxation was concerned. The man might be a legal resident in the country and might be domiciled there ; but if he lived for a part of the year in the city and did business there, he was, by this statute, to be taxed in the city, though domiciled elsewhere.

In the views above given, we think that no error was committed in charging that residence was equivalent to domicile in this statute.

The defendant asked the court to direct a verdict in his favor. That presents the question whether, on the evidence, it could be said that the defendant had his residence and domicile in New York, as a matter of law. There is no doubt that defendant's long continued living in New York would be strong evidence that that place had become his domicile. But there are other facts. Defendant was born in Owego, and resided there till 1878. Since that time he has never kept house. He has voted at Owego during all this time, whenever he has voted at all, at local, State and national elections. In 1880 his vote was challenged there, and he took the necessary oath. He states now, under oath, that he never intended to abandon his legal domicile in Owego. There are, also, other facts to which we need not refer. Of course, the defendant was originally domiciled in Owego. It has often been said that to change one's domicile was a matter of intention and of act. Mere residence in another place, without the intention to change the domicile, is not enough. (Jacobs on Domicile, §§ 115, 181, 182.)

In *Shelton* v. *Tiffin* (6 How. [U. S.], 163), on the question of change of domicile from one State to another, it was said : "An exercise of the right of suffrage is conclusive on the subject," that is, on the intention. To the same effect is *Kellogg* v. *Oshkosh* (14 Wis., 623.) The act of voting is, at least, evidence that the voter believes, and claims himself to be, a resident and domiciled

where he votes. (Jacobs on Domicile, § 435.) In the present case there is the further fact that the defendant, in 1880, took the necessary oath at Owego when challenged. By this he stated that he had been then a resident of the county for four months, and of that election district for thirty days. Certainly, for the purpose of voting, a man cannot have two residences; and we have already seen that residence for voting and residence for eligibility to local office are, and in the nature of the case must be, the same. Hence it could not be held on the facts, as matter of law, that the defendant's residence, either for voting or for local office, was in New York city. Whether, as a matter of law, it was not in Owego we need not say.

An exception is made on defendant's points to the admission of a juror on the ground that he was not "well informed." It seems to us that, on that matter, we could not safely overrule the trial court. It is a question of fact as to which, the appearance as well as the answers of the juror, must be considered. In regard to the peremptory challenge to the juror Carroll, so far as we can understand the practice which was followed by the court in regard to the peremptory challenges, there was no error. (*People* v. *Carpenter*, 102 N. Y., 239, 247.) The defendant's counsel seems to have intentionally refrained from making the challenge, when opportunity was plainly given, in order to make it afterwards, that they might except to the judge's refusal. We ought to be slow to find error where a party has deliberately neglected to challenge, when he might have done so, with the purpose of getting what he deemed to be an erroneous ruling a few moments after.

The defendant claims that he should have been allowed to open and close. The complaint did not follow the old form, which only alleged that defendant usurped and unlawfully exercised a certain office, and called on him to show his authority; but it set up the defendant's alleged authority, viz., the appointment by the governor; and then set up the alleged defect, viz., defendant's residence in Owego, and not in New York city. The answer set up no other title to the office than that alleged in the complaint. No motion had been made (so far as appears) to correct or to strike out anything from the pleadings; but on these pleadings the parties went to trial. The plaintiff then had affirmatively set up and admitted the authority under which the defendant claimed, and

it was not necessary for defendant to prove it. The plaintiff averred that defendant was not competent, and that was a fact for the plaintiff to prove. (What is called the second cause of action was waived by plaintiff.) This view of the pleading is the same taken by the Special Term on the demurrer. No question was under discussion at that term as to which party had the affirmative of the issue, as such issue had been made. The defendant on the trial had nothing to prove in the first instance, because his appointment was admitted; his incompetency to hold the office was for plaintiff to establish. In the points for the plaintiff on this appeal there is a discussion in regard to the challenge to the array, and in respect to the time of drawing jurors, etc. We find nothing on this subject in the points for the defendant. On examining the facts of this case in the light of *Friery* v. *People* (2 Abb. App. Dec., 216); *Ferris* v. *People* (48 Barb., 17; S. C., 35 N. Y., 125), etc., we think there is no ground to reverse the judgment for any error in the overruling of this challenge.

The judgment appealed from should be affirmed, with costs.

INGALLS, J.:

My associates have each examined this case with care and have reached opposite results. Their opinions show exhaustive research, and it seems as though but little can be profitably added upon either side of the question involved. My examination of the case has led me to the conclusion that the cause was properly disposed of at the circuit, and that the judgment should be affirmed. I, therefore, concur in the result reached by Justice LEARNED, and mainly in the reasoning contained in his opinion. Without attempting to discuss at length the question involved, I will proceed briefly to state the conviction which the examination of the case has produced upon my mind. On the 29th day of April, 1863, the legislature passed an act entitled "An act establishing a Quarantine and defining the qualifications, duties and powers of the Health Officer of the harbor and port of New York." (Laws of 1863, chap. 358.) This statute defines, with precision, the purposes sought to be accomplished thereby, and prescribes the duties which such statute intended to devolve upon those who were to be appointed to execute the same. It seems quite evident from its provisions that the legislature regarded

the duties thus imposed, important, responsible and *local in their nature*, and sufficiently onerous to engross the undivided time and attention of the officials who should undertake to discharge such duties. Section 54 of such act provides as follows : " Section 54. The Governor shall nominate, and by and with the advice and consent of the senate, appoint three discreet persons, citizens of this State, who shall be residents of the Metropolitan police district, as commissioners of quarantine, for the purposes of this act, who shall hold their offices for three years and until their successors shall be appointed and qualified. He shall every three years thereafter, and as often as vacancies shall occur by reason of death, resignation, insanity or *removal from the said district*, appoint, by and with the consent of the senate, citizens as aforesaid, *who shall reside in said district*, to fill the places of those commissioners whose terms shall expire or become vacant, and the persons so appointed shall hold their offices for three years, and until their successors shall be appointed and qualified." It is difficult to conceive a more significant and emphatic declaration than that contained in this section in regard to the required place of residence of the persons who should be appointed to act as such commissioners — " Three discreet persons, citizens of the State, *who shall be residents of the Metropolitan police district.*" Why require that they should be residents of such district? We cannot reasonably infer that such provision was inserted in such statute without an adequate motive therefor. We are to seek such motive from the provisions of the statute, the purpose of its enactment, and the nature of the powers and duties created thereby. The duties which the statute devolved upon such commissioners *were local in their character*, in regard to the place of their performance, and, presumably, sufficiently burdensome to occupy the time and attention of such officials. It may be reasonably inferred that the law-makers assumed that an actual resident of such district would probably be better informed in regard to the nature of the duties which he would be called upon to perform, and would be likely to discharge the same with greater intelligence and more undivided attention than could be expected of a person who did not reside in such district, and whose interests, business and associations were divided between such district and other portions of the State. In framing such statute, it is to be

presumed that the expression, "*who shall be residents of the Metro-politan police district*," was employed in its ordinary sense, and was intended so to be understood; and it is not at all probable that the bewildering distinction sought to be drawn between domicile and residence ever occurred to the minds of the law-makers. The learned justice at the circuit took a practical view of the question, and, I think, a defensible one, when he held, in substance, that within the *contemplation of such statute*, that the words residence and domicile were to be regarded as synonymous. The following proposition, which was consistent with such ruling, was submitted to the jury for their determination: Did the defendant Thomas C. Platt have a legal residence and domicile on the 29th day of January, 1880, in the Metropolitan district? The submission of such question to the jury was accompanied by instructions which did no injustice to the defendant or his case, so far as I am able to dis-cover. It seems to me that the entire case, upon the merits, was substantially reduced to one question of fact, viz., the question of residence; and that such question was fairly submitted to the jury and their finding thereon, in view of the evidence at the trial, cannot be regarded as unsupported by competent evidence. Nor do I think the evidence preponderates so decidedly in favor of the defendant's case as to call upon this court to set the verdict aside, or to reverse the judgment upon that ground. The evidence shows that the defendant retained his position as president of a bank at Owego; that he continued as a partner of a manufacturing business at the same place. He also claimed the right to vote at Owego, and, being challenged, took the required oath, in which he stated that he was a *resident of that place.* He made an affidavit, in which he stated that he intended to retain his domicile in Owego. The defendant also claimed the general right to exercise the elective franchise at the same place. More unequivocal and satisfactory evidence in support of residence can hardly be imagined than that furnished by the foregoing acts and declarations of the defendant, and which yield substantial support to the verdict rendered by the jury. Without attempting to discuss at length the question of domicile and residence, I refer to the definition given by Webster, in his Unabridged Dictionary, of such words. Domicile is defined: "1. An abode or mansion; a place of permanent resi-

dence, either of an individual or family. 2. *Law.* A residence at a particular place, accompanied with positive or presumptive proof of an intention to remain there for an unlimited time." Burrill: "To establish in a fixed residence, or a residence that constitutes habitancy; to domiciliate." Kent: Residence is defined: "1. The act of residing, abiding or dwelling in a place for some continuance of time. 2. The place where one resides; an abode or dwelling; a habitation. 3. Hence the place where anything permanently rests (Syn. Domiciliation); inhabitancy; sojourn; stay; abode; home; dwelling; habitation; domicile; mansion." In Williams on Executors ([Phil. ed.], vol. 2, p. 1368), the author says: "A man's domicile is *prima facie* the *place of his residence*; but this may be rebutted by showing that such residence is either constrained from the necessity of his affairs or transitory." Accompanying the text is to be found a note in which the subject is quite fully discussed with citation of authorities. In *Hegeman* v. *Fox* (31 Barb., 476), Justice EMOTT remarks: "A domicile has been described by American authorities as residence at a particular place, with an intention of remaining there an unlimited time. * * * There must be both the fact of abode and the intention of remaining indefinitely to constitute a domicile. Both must, therefore, be proved." It seems quite apparent that the subject is involved in a net-work of speculation and ingenious theories which, in my judgment, are foreign to the purpose, nature and policy of the statute under consideration. I apprehend that it will be found, upon examination, that whenever the term "domicile" has been used in contradistinction to "residence," that the circumstances under which the term has been thus employed have been extraordinary and exceptional. Considering, therefore, the nature and requirements of said statute, the definitions which have been given to the words "residence" and "domicile," and construing such statute according to the ordinary and fair import of the language employed in framing it, I am persuaded that the learned justice intelligently and properly disposed of the question at the circuit by ruling as he did and in submitting the question to the jury in the form adopted by him.

The legislature possessed the power to enact such statute, and to prescribe the terms and conditions upon which official position could be accepted under the same; and it may be assumed that the defend-

ant accepted the appointment voluntarily, and with a full knowledge of the requirements of such statute. If such statute should be regarded too restrictive in regard to the place of residence required of the person desiring to hold office under the same, the legislature, and not the court, is to provide the remedy. In regard to the retention of the juror Clowrey, while his examination did not disclose a great degree of intelligence, especially in regard to the political history of the State, yet he may have possessed capacity sufficient to have enabled him to exercise sound judgment in regard to the question upon which he was called upon to pass. He was plied with questions which were calculated to perplex and embarrass him, and his surroundings were not such as to produce composure, and to enable him with facility to exercise his faculties. It was peculiarly the province of the trial court to pass upon the competency of the juror, based upon his appearance and examination, and there is not, I think, in the case evidence of an abuse of judicial discretion which calls for a reversal of the judgment upon that ground; nor was a fatal error committed by overruling the defendants' peremptory challenge of the juror Carroll.

Regarding the practice established by the court at the trial in regard to impanneling the jury, and the course pursued by the respective counsel in reference thereto, and bearing in mind that this was the trial of a civil and not a criminal action, I am convinced that, under all the circumstances, it became a matter of discretion with the court whether to allow or to reject such challenge. (*The People* v. *Carpenter*, 102 N. Y., 239.) Certainly the rule in this respect should be enforced with less rigor in a civil than in a criminal action.

The judgment should be affirmed, with costs.

LANDON, J. (dissenting):

What is meant by the words of the statute — "who shall be residents of the Metropolitan police district?" A resident of a place is one who dwells in it for a continued length of time, and at the time in question is still dwelling in it. The word "residence" or "resident" is in frequent use in statutes and American Constitutions. Whenever any doubt arises respecting its meaning, that doubt is usually solved either by the context or by a consideration of the object sought by its use; or by both. The Constitution and statutes

of the State recognize the fact that a person may have two or more residences at the same time. "For the purpose of voting no person shall be deemed to have gained or lost a residence by reason of his presence or absence" for certain specified purposes. (Const., art. 2, § 3; *Silvey* v. *Lindsay*, 107 N. Y., 55.) The implication is thus clear that for any other than the purposes of voting a person may, in the enumerated cases as well as in others, gain a new residence, or lose the old one; or have two or more. The plurality of a person's residences and the ease of changing them, and their quality as temporary or permanent, are recognized in the constitutional provision that to entitle a citizen to vote he must have been "an *inhabitant* of this State one year next preceding an election, and for the last four months a *resident* of the county, and for the last thirty days a *resident* of the election district," etc. (Id., § 1.) He thus has the whole State for his inhabitancy for the first eight months; but must localize his residence within a county for the last four, and within one election district for the last thirty days. He can vote there, and "not elsewhere;" that is, not at any of the other places of his residence. That his domicile is at a different place from his residence, as thus constitutionally defined, is no doubt immaterial. (*People ex rel. Frost* v. *Wilson*, 62 N. Y., 186.) For the purposes of taxation, if a man has more than one residence, the statute prescribes at which place of residence his personal property shall be taxed. (Chap. 92, Laws of 1850, p. 142; *Douglas* v. *Mayor*, 2 Duer, 110; *Bell* v. *Pierce*, 51 N. Y., 12.)

The statute of limitations has respect to a person with a residence in the State, and also a residence out of the State at the same time. He may keep his residence within the State, and yet be a resident of another State, and the time of limitation will be extended by the periods of his residence abroad. (*Cole* v. *Jessup*, 10 N. Y., 96.) In the case of a pauper the statute exacts something more than mere residence in order to establish his legal settlement. He must be "a resident and inhabitant" of the town for one year. (1 R. S., m. p. 621, § 29.) He must inhabit the town of his residence. Attachments against non-resident debtors are not avoided by the fact that the debtor has a residence within the State, if at the time of the attachment he inhabits his residence out of it. (*Haggart* v.

*Morgan*, 5 N. Y., 422; *Matter of Thompson*, 1 Wend., 45; *Frost* v. *Brisbin*, 19 id., 14; *Matter of Wrigley*, 8 id., 141.)

Thus it appears that the term "resident," when used either in Constitution or statute, does not exclude the idea of two residences, but in certain cases appropriate terms are employed to designate at which residence certain duties shall be discharged and privileges enjoyed. The inference seems valid that in the absence of any need for restrictive words none are implied.

The English cases are to the effect that whenever residence is prescribed by a statute, such meaning must be given it as tends to accomplish the purposes of the requirement. If a subscribing witness must add his place of residence to his name, he may designate that place where he is most usually to be found. (*Blackwell* v. *England*, 8 Ell. & B., 541.) If the maker of a bill of sale, he must designate that place which will best tend to identify him. (*Hewer* v. *Cox*, 3 Ell. & Ell., 426.) If residence at the University of Oxford is prescribed in order to qualify for participation in its government, actual and not constructive residence is required. (*Queen* v. *Vice-Chancellor*, L. R., 7 Q. B., 471.) The residence to qualify a person for registration as a voter is thus defined: "A party must possess, at least, a sleeping apartment, but that an uninterrupted abiding at such dwelling is not requisite, and that absence, no matter how long, if there be the liberty of returning at any time, and no abandonment of the intention to return whenever it may suit the party's pleasure or convenience so to do, will not prevent a constructive legal residence." (*Bond* v. *St. George, Hanover Square*, 3 L. R., 6 C. P., 314.)

An examination of the statute under which the defendant was appointed makes it plain that the legislature intended that the appointee should be personally and actually a resident of the district, and not merely constructively so. Section 52 of the act reads: "It shall be the duty of the commissioners of quarantine to hold daily meetings, Sundays and customary holidays excepted, from the first day of May until the first day of November in each year, and as often in the other months as in their judgment may be necessary." Actual residence would secure personal presence and opportunity for efficient service. Had defendant's actual residence been and

continued in Owego, and his constructive residence in New York, the purposes of the statute would have been in danger of defeat.

Something more than residence is prescribed by the statute. The appointees must be " citizens of the State." The legislature thus expressed a loyalty to the State, and provided some guarantee for it in the status of the appointees. It also required them to be " discreet persons." The qualifications of the defendant satisfy both the letter and the spirit of the statute. The further inference seems valid that this statute, which expresses, with aptness and fullness, particular essentials of eligibility, excludes the implication of more. This inference is strengthened by the consideration that the condition sought to be added is non-essential. Whether the defendant's domicile was constructively in the one place or the other was of no moment so long as his actual personal residence was in the city of New York and his domicile and citizenship of the State. The same law prescribes his duties in either case. These inferences seem further strengthened when we consider the use made of the term " domicile " as a factor in jurisprudence. We are not advised that the word appears anywhere in the statutes of the State. The " Political Code," proposed by the commissioners in 1859, used the word in defining citizenship — a definition which would now be superseded by the fourteenth amendment to the Federal Constitution. One would naturally look for the word in those statutes which make jurisdiction dependent upon residence, as actions for divorce, administration of estates, care of paupers, and the effect of insolvent discharges. It is a term of private international law, and, by analogy and from convenience, is often used in inter-state law and in *infra*-state law in determining which of two conflicting jurisdictions is the right one.

When a man has but one residence, in fact and intent, that residence, in both legal and common acceptation, is his domicile. The two words may then be considered synonymous. As most persons have but one residence, the meaning of the two words is generally much the same. When no distinction exists none is made. It is when a person has no known residence, or the country or jurisdiction in which it exists is doubtful, or he has two residences, one in one country or jurisdiction and the other in another, and it becomes necessary in any of the cases stated to determine which of the two

jurisdictions may of right give the law affecting his property and personal rights, that the legal idea of domicile becomes significant. It is then important to determine, not where he resides, but to what country or jurisdiction he belongs, to the end that his personal property, in case of his death, may be distributed according to the law of his own country or jurisdiction, that the validity of his divorce, and in some countries of his marriage, the legitimacy of his children, and the binding force of insolvent discharges may be, by the like law, determined. And, in case of war between the country of one's origin and the country of his residence, the place of domicile may determine whether he and his property are to be governed by the rules applicable to a friend or an enemy. Of course, when the law of the domicile instead of the law of the place of residence should prevail, the distinction between residence and domicile must be made. That distinction is marked.

In *Bell* v. *Kennedy* ( L. R., 1 Scotch and Div. App. Cases, 307), Lord WESTBURY said: "Residence and domicile are two perfectly distinct things. It is necessary in the administration of the law that the idea of domicile should exist, and that the fact of domicile should be ascertained in order to determine which of two municipal laws may be invoked for the purpose of regulating the rights of parties. We know very well that succession and distribution depend upon the law of domicile; domicile, therefore, is an idea of law."

Every person has a domicile somewhere, though he may have a residence nowhere. He can have only one domicile at once, though he can have two or more residences. He has a domicile of origin; this he retains until he acquires another of choice. Domicile once existing remains until another is acquired. The acquisition of the latter is always the abandonment of the former. To determine one's domicile is to determine to what country or jurisdiction he belongs, whether by origin or adoption; the place of origin being presumed until that of adoption is proven. (*Dupuy* v. *Wurtz*, 53 N. Y., 556; *Crawford* v. *Wilson*, 4 Barb., 505; *Hegeman* v. *Fox*, 31 id., 475; *Mitchell* v. *United States*, 21 Wall., 350; 2 Kent's Com. 430, notes; *Desmare* v. *United States*, 93 U. S., 605; *Isham* v. *Gibbons*, 1 Bradf., 69; Whart. Conflict of Laws, § 55; Story's Conflict of Laws, § 41.) The difficulty of exact definition of the term "domicile" is confessed by judges and text-writers.

(Wheat. Int. Law, § 320; *Thorndike* v. *City of Boston*, 1 Metc., 245.) The defect is sought to be supplied by the precedents which give instances of exclusion and inclusion. The idea of the domicile of origin is easily grasped, as is also that of choice when the person has but one residence, and that a permanent one.

"Domicile of choice," said Lord WESTBURY, in the case of *Udny* v. *Udny* (L. R., 1 Scotch and Div. App. Cases, 458), "is a conclusion or inference which the law derives from the fact of a man fixing voluntarily his sole or chief residence in a particular place with an intention of continuing to reside there for an unlimited time. This is a description of the circumstances which create or constitute a domicile, and not a definition of the term. There must be a residence freely chosen, and not prescribed or dictated by any external necessity, such as the duties of office, the demands of creditors, or the relief from illness; and it must be residence fixed not for a limited period or particular purpose, but general and indefinite in its future contemplation." The authorities above cited, as well as many others, are in accord with this description. The idea is of a home residence, kept in fact and in intent, with the view to permanency, though business, pleasure, health or constraint may lead to the occupation of a temporary and long-continuing residence elsewhere. There is no need that we should decide in this case whether the defendant's domicile still remains in Owego. Here is no question of competing jurisdictions or of conflicting laws. In any event the defendant was domiciled in the State of New York, and a resident of its Metropolitan district.

In *People* v. *Flanagan* (66 N. Y., 240) the title of the defendant to his office was challenged upon the alleged ground that the election was not authorized by the terms of the statute. The court said: "Being a question between the defendant and the people, and dependent upon the construction to be given to acts of the legislature, it seems reasonable that the defendant, whose good faith is not questioned, should have the benefit of the most favorable construction." The word resident is used in its simple sense, and the circumstances which, under other statutes, sometimes require an examination to determine whether the idea of domicile is also implied, are absent. The words of the statute, its purpose and meaning, the circumstances and the reasonableness of the case, as

well as accepted usage, forbid that we should confuse the simplicity of the conditions of the defendant's eligibility by the interpolation of a separable and non-essential element.

The judgment should be reversed, with costs of this appeal, and as the facts are not in dispute, the complaint should be dismissed on the merits, with costs of the court below.

Judgment affirmed, with costs.