HEGEMAN, executor, &c., *appellant, vs.* SARAH M. P. FOX, *respondent.*

What is to be considered the *domicil* of a person, at the time of his death, for the purpose of determining the rights of his widow in his personal estate.

There must be both the fact of abode and the intention of remaining indefinitely, to constitute a domicil.

Both must therefore be proved. The first is readily proved as a single fact; the other may be established by declarations of the party, or by his conduct.

Circumstances which were held sufficient, in this case, to show that the deceased had, at the time of his death, not only an actual residence in the state of Florida, but that he had acquired the same with the intention of remaining there an unlimited or indefinite time.

APPEAL by Joseph Hegeman, one of the executors of Austin D. Moore deceased, from a decree of the surrogate of the county of Kings, made upon a petition of the respondent,

the widow of the testator, for a share of the testator's personal property. The surrogate decreed that she was entitled to one third of the personal property, as claimed.

*B. G. Hitchings,* for the appellant.

*A. W. Bradford,* for the respondent.

*By the Court,* EMOTT, J. This is an appeal from a decree of the surrogate of Kings county, adjudging that the respondent, as the widow of Austin D. Moore, was entitled to one third of all his personal property, absolutely, and notwithstanding the provisions of his will. The surrogate made this decision upon the ground that Austin D. Moore was, at the time of his death, domiciled in the state of Florida. The laws of that state were proved, and it appeared that they provide for a distribution to a widow of one third of the personal estate of which her husband should be possessed, notwithstanding any disposition of it by will. This is not disputed; nor is the rule denied that the law of the place of domicil will control the disposition and distribution of personal property, in cases both of testacy and intestacy. The question is, whether the surrogate correctly decided that Austin D. Moore had, at the time of his death, his domicil in Florida.

A domicil has been described by American authorities as residence at a particular place, with an intention of remaining there an unlimited time; and the definition is cited with approval by a learned civilian, who has published a very excellent compendium of the law upon this subject. (*See* 1 *Binney,* 349; 16 *John.* 128; 8 *Cranch,* 253; *Phill. on Domicil,* 13.) There must be both the fact of abode and the intention of remaining indefinitely, to constitute a domicil. Both must therefore be proved. The first is readily proved as a single fact; the other may be established by declarations of the party or by his conduct, which is at least as satisfactory evidence as his declarations, upon such a question.

In the present case there can be no dispute as to the fact that Mr. Moore, at the time of his death, had an actual residence in Florida. . He owned and occupied a house and plantation near Jacksonville; he had his family there with him, and he had no other dwelling house or place of abode. His farming or planting upon these Florida lands was the only business in which he was engaged, and from the time of his leaving Brooklyn, in 1855, until his death in 1857, he remained constantly in Florida, and after his purchase, upon this plantation. It only remains, therefore, to determine whether this residence was acquired *animo remanendi*, with the intention of remaining there an unlimited or indefinite time.

Mr. Moore was born in Massachusetts, and after residing successively in various places in that state, he removed to New York city and went into business. He married there, and accumulated a considerable property. Some six or seven years before he went to Florida, he left New York and went to reside in Williamsburgh. At or after this time he relinquished business, and invested his accumulations in real estate, mostly in Brooklyn and Williamsburgh, in bonds and mortgages probably upon property in the same locality, and in Williamsburgh ferry stock. He kept house with his family in a dwelling which he owned in Williamsburgh, and was no doubt domiciled in that place until he left for the south.

It is true that this domicil in Kings county, New York, continued until he had abandoned it and acquired another, in fact and in purpose. If he was not, at the time of his death, a resident of Florida, he was a resident of Williamsburgh; the question is between these two domicils. But it is not a question between two actual domicils in fact and in intention, which ought to be considered the principal. I can see no indication that the testator retained his domicil in Williamsburgh in fact or in purpose. If that still continued to be his residence, it must be because he had not, at the time of his death, acquired another residence in any definite place, and therefore his previous domicil continued, in the view of the

law.    This might be and would. have been the case if he had died while traveling in search of a place where he might tarry or settle, with no place determined upon as a residence, al= though he had left the state of New York with a fixed inten= tion of selecting and removing to some other abode.    This, however, is not the case.    The facts proved or admitted, as well as the statements and declarations of Mr. Moore, are sufficient to show that he left Williamsburgh with the inten= tion of abandoning his residence there for a new abode in some other place.    He sold his house and his furniture, he removed his family, he closed his bank account, and made such arrange= ments of his affairs as were natural for a person permanently leaving the place. ˙ The evidence as to his declarations and conversations, at the time of his departure and afterwards, is to some extent conflicting upon the question of his intention, although I think the weight of it is that he neither expected nor intended to return to the northern states.    In any view of the testimony it is material to observe that he expressed no desire or intention to return to Williamsburgh.    He spoke of returning from the south to reside in New York, or on the banks of the Hudson river, but I do not perceive any proof that he looked forward, under any circumstances, to resuming his residence in Williamsburgh.

The question then is whether he acquired a residence in Florida, or whether he continued a mere traveler, with no in= tention of becoming domiciled any where, after he left this state, and therefore continued to hold a legal domicil here. The proofs are, we think, sufficient and satisfactory upon this point.    I refer to the proof of his acts, rather than to his written or spoken declarations.    To the evidence of what he said, at various times, I attach little importance.    It comes to us impressed with the character of the particular mood of the man when he uttered it, which no doubt varied and was affected by the condition of his health, by his family circum= stances, and by other causes.    It is colored more or less by the medium through which it comes, and it depends altogether

upon the recollection of witnesses. Nor do I consider the statement in Mr. Moore's bill in chancery, that he was an inhabitant of Florida, standing alone, as at all decisive. It was necessary for him to make such an allegation for the purpose of his suit, and he might very well have made it without fully considering its import or its extent, or its consequences in other relations. Coupled, however, with his conduct, it is evidence which may disclose another motive for a wish on his part to acquire a residence in Florida, at or after the time when he settled near Jacksonville. It may have been not merely the desire of permanent occupation, the attractions of the climate, and the hope of restored health which led him to settle as a planter. He may also have been disposed to avail himself of the laws of Florida upon the subject of divorce, to terminate his domestic troubles. When the suit which he commenced for that purpose did not seem likely to accomplish what he desired, he expressed a purpose to return to New York, that the laws of that state might govern the distribution of his property at his death. He must have had in mind the very contingency which has now occurred, and which, under the laws of Florida, he was unable to prevent. His remark can hardly have had reference to the disposition of his real estate in Florida only, for a sale and conversion of that would have accomplished as much as his leaving the state, if he were not a resident of the state and subject to its law as to his property. These statements and his conduct give color to each other, and lead strongly to the conclusion that his residence in Florida was both understood and intended by himself to be permanent, and that he was not at all times influenced in the matter by considerations connected with his health.

I consider Mr. Moore, as I have already said, to have formed and manifested a purpose of abandoning his New York domicil, when he sailed for the south. I find in his subsequent acts satisfactory evidence that having abandoned his former domicil he determined not to live as a sojourner or a

wanderer, but to settle and acquire a new abode on a Florida plantation. In January or February, 1856, after having spent some time as a guest in a hotel, pleased with the country, the people and the climate, and desirous for family as well as other reasons to have a home, he purchased a somewhat extensive plantation. He proceeded to stock the plantation and to furnish the house. He entered into the business of planting and the various occupations connected with fitting up his place, with energy and satisfaction. He sent for his brother with his family, to oversee the plantation, prepared to send for his daughters from the north, where he had originally intended to leave them for the purpose of education, and endeavored to provide for their instruction by a governess, in Florida. He went to housekeeping, and lived in every respect as did other residents, so far as his domestic affairs did not interfere with him. His troubles with his wife broke in upon his plans. They led him, no doubt, to have the deed of his property originally taken by another person, and they induced a purpose, or the expression of an intention, of returning to New York. This has been already alluded to in another connection. It is sufficient here to say that if that purpose was not effected, it cannot alter the law or the fact as to his domicil in Florida, if such existed at the time.

Against all the acts, declarations and motives which have been thus briefly alluded to, there are no facts to be set, except the estate in real and personal property which the testator retained in Kings county, and his previous domicil there; and this I find every evidence of his design to abandon at any rate. These facts, considered in themselves, appear to me clearly insufficient to countervail the preponderance of evidence in favor of the Florida domicil.

But it is said that all the acts and manifestations of purpose which are proved in the case are deprived of their effect, and that whatever the testator did, could not legally produce a change of his domicil, because these acts were done under the stress of impaired health, and the change which he made

was compelled by that reason. It may be conceded that Mr. Moore broke up his establishment in Williamsburgh in consequence of his enfeebled health, and went south in order to its restoration, or rather to the prolongation of his life in a milder climate, and that if it had not been for this, he would never have left this state. It is said that absence from an established domicil will not effect its loss, if such absence be compulsory; and that it is compulsory if occasioned by ill health. The case of the invalid is likened to that of the exile, the soldier or the ambassador. To a certain extent these propositions are undeniably true. Mere absence, when compelled by the urgency of sickness that will admit of no delay to avert an immediately fatal termination, cannot take away a man's residence in the home which he leaves, or fix it in the place to which he goes. A man who flies from the rapid approach of death has no other motive, and does not exercise the choice which is necessary in a change of his home and permanent abode. But the whole matter is a question of intention, and no arbitrary rule is to be laid down in relation to it. None of the cases cited from the English courts will be found to assert any such rule. In most of these cases the question has arisen where an Englishman has gone to a foreign country, to Madeira or Portugal or the south of Europe, to recover health or because the climate at home was too severe. In *Stanley* v. *Bernes*, (3 *Hagg.* 373,) Sir John Nicholl inclined to the opinion that a British subject could not acquire a foreign domicil by any residence abroad occasioned by ill health, and unaccompanied by an attempt to cast off his national character. But the court of delegates reversed his decision, and held that an Englishman may become domiciled abroad without ceasing to be an English subject. But the fact and the rule as to the facility with which a domicil may be changed, or the evidence necessary to prove an intention to change it, from one state of this confederacy to another, must obviously be different from that which is to be looked for in order to establish a determination to leave one's native country for another and a foreign

country. The cases are not analogous in a very striking and essential point. In the case of *Johnstone* v. *Beattie*, in the house of lords, (10 *Cl. & Fin.* 43,) which was cited on the argument, the point determined was that the English court of chancery had power to appoint guardians for an infant who was residing in England, notwithstanding her domicil was in Scotland. The observations of Ld. Campbell, in his dissenting opinion, are upon the facts in that case, where it appeared that the family mansion was in Scotland, and there also was the property of the infant and her mother; so that he expressed the assurance that the daughter would return to the mansion of her ancestors. There is little in the present case which can be said to be parallel to these facts. The case of *Hoskins* v. *Matthews*, (35 *Eng. Law and Eq. Rep.* 532,) resembles the present case much more nearly. The decedent there was held to have acquired a Tuscan domicil, a domicil, be it observed, in a foreign country, by residence, the purchase of a villa, and the establishment of his family there, making it, in the language of the very able opinion of Lord Justice Turner, the place from which he went forth, to which he returned, and in which he expected to die. This domicil was recognized by the court, notwithstanding that the decedent's property and papers were left in England, his bank account continued there, his attachment for England was strong and his desire to return thither often expressed. He did not mingle in Italian society, took no part in public affairs, carefully preserved his foreign character, and held in avowed detestation the priesthood and religion of the country where he was living. Certainly the present is a stronger and more favorable case for the acquisition of a new domicil than that. But a more material feature of that case, in respect to the present controversy, is that Mr. Mathews was induced, or as we might say compelled, to leave England by the attacks of a disease which he hoped to mitigate or to cure by a residence in another climate. He was obliged by his health to live in another country than that of his birth. The judge observes that it was the staple of the argument before him

against the change of domicil, that domicil could not be founded upon such a compulsory residence, and that is the reasoning here. But he does not recognize the rule contended for, and his observations, which appear to us to be exceedingly judicious and sensible, cannot, we think, be cited in favor of the present appellant. We understand the degree of compulsion to be, in effect, the same in that case as in the one before us. Mr. Moore, when he left New York, was not in any immediate danger, any more than Mr. Matthews when he left England: or at least, which is the material point, he did not suppose he was. He was not like a man fleeing a pestilence or an attack of disease threatening instant death, and therefore leaving no space for choice, and no motive but necessity. It is going altogether too far, and much farther than Sir George Turner felt willing to go in the case referred to, to say that ill health, the necessity of finding a milder or a better climate, to live comfortably or to live at all, is not to be admitted as a motive for a change of residence. Such circumstances may create a sort of necessity, but it is a moral necessity, acting upon the will. And whenever there is an act of volition, a determination to abandon the old home and make a new one, it is not material what motives have induced the choice. Undoubtedly there may be cases, as Sir George Turner observes, in which even a permanent residence in a foreign country, occasioned by the state of the health, may not operate a change of the domicil. But in these questions every case must stand upon its own circumstances. The cases in which the residence of an invalid in a foreign country, or even in a distant portion of his own country, will not create a domicil, may be understood by comparing them with the case of the exile, or as the text writers denominate him, the emigrant, which they more nearly resemble. The fugitive from revolution or civil war comes to his new abode with no intention of abandoning his country, or of permanently remaining abroad. He is coerced by causes which approach to, if they do not constitute, actual physical compulsion, and his manifest purpose is only to remain in his new

abode as long as these causes operate, and when the necessity for absence is removed, to return.  There may be cases of instant fear of death by sickness, which resemble this, but where a man deliberately breaks up his residence, purchases a new mansion, engages in new occupations, and acts in every respect as a man would who was settling himself altogether from choice and free will, he must be acting under the control of motives and not of necessity, and he looks forward to no return.  He goes to another region to obtain that health which he is convinced he cannot enjoy where he is, and he is much more like the man who changes his abode in quest of fortune, that he may gain a living, or a competence which he sees he cannot get at his present home.  If there be satisfactory evidence in this case, as we all think there is, of Mr. Moore's intention to break up his residence in Kings county, and subsequently to make Florida his home, we think the force of this evidence is not destroyed by the fact that he was driven to the step by what he considered the necessity of preserving his health or his life.  We might as well hesitate to say that he lost his domicil of origin when he removed from Massachusetts to New York, doubtless under the belief that he must do so in order to earn the fortune which he sought, or perhaps the very means of living.  We agree therefore with the conclusion of the surrogate that Mr. Moore was, at the time of his death, domiciled in the state of Florida.

There was one exception taken in the course of the hearing in the surrogate's court which was strongly pressed upon our notice.  In the progress of the trial it was deemed important to introduce portions of the correspondence of Mr. Moore, in order to show his motives and intentions.  A Mr. Field, to whom a number of these letters had been addressed, was called as a witness by the respondent, and proved certain letters, portions of which were read and the residue suppressed on his statement that it was confidential between him and the testator, and immaterial to the cause.  This was done without objection by any party.  Subsequently the same witness was

served with a subpœna on the part of the present appellant, to produce all the correspondence. On his examination under this subpœna he admitted its service upon him, and stated that he had not brought the letters. He was questioned somewhat as to their character, and when he alleged that they were immaterial to the case, and that their contents were private and confidential, the appellant endeavored to ask him the import of that part which he stated to be of a confidential character, but his question was overruled. We see no just ground of exception to the exclusion of these questions. The inquiry was not material to the merits ; it was addressed to the discretion of the surrogate if it were to be heard at all, and he should have had the documents themselves before him to decide it. If the contents of the letters were material to the issue in the cause they could not be proved in that way. The counsel for the executors then asked the surrogate for an order compelling the production of the letters, which was refused, and the counsel excepted. The letters were not in court, and the only order which the surrogate could have made, so far as we can perceive, would have been an order for an attachment, or a commitment of the witness for a contempt, in not producing what the subpœna commanded. If an adjournment had been applied for, in order to reach the papers by such proceedings, that would have been an application to the discretion of the surrogate which we could not review. The application which was made, or the ruling upon it, was still less a subject of exception. Besides being addressed to the discretion of the court, it was a matter between the party and his own witness, and not between party and party. We could not reverse a decree to which the respondent is in our opinion justly entitled upon the merits, because a contumacious witness of her adversary refused to obey the process of the court, or to furnish the evidence which it demanded, or because the surrogate, it may be improperly, refused to punish him for his refusal. The respondent is not answerable for the conduct of the appellant's witness, nor for any error committed by the court in

dealing with him. Whatever hardship may have been inflicted upon the respondent by the course of this witness, we are all of opinion that there is nothing presented by this part of the case which would justify our interfering with the decree.

The decree of the surrogate is affirmed.

[DUTCHESS GENERAL TERM, May 14, 1860. *Lott, Emott* and *Brown,* Justices.]