⌐ *In re* ZEREGA'S WILL. ˙

*(Surrogate's Court, New York County, Filed October, 1892.)*

TESTATOR'S DOMICILE—WHAT CONSTITUTES.

A testator was domiciled in New York City prior to 1854, and thence till 1863 in Westchester County, where he had purchased a country

residence. In 1863 he purchased a house in New York City, where he
maintained a residence for twenty-five years subsequently till his death.
He lived seven months each year in the New York City house, and all
the evidence showed that he exercised absolute ownership thereover,
although his married daughter and her husband lived with him. In
1876, on qualifying to be an executor, he described himself as a resident
of New York City, and in 1887 he wrote a recommendation for his
gardener, stating that if he was ever in want of a gardener for his
"country place" he would take him as such. There was no evidence
that he had voted subsequently to 1863. *Held*, that his domicile was
in New York County, although he had made declarations under circum-
stances not disclosed that he had bought the New York City house for
his daughter, that he had his "home" in Westchester County, that he
had paid his taxes in latter county, that he had made wills in 1872
and 1885, describing himself as of Westchester County; that he had
advertised his place in latter county for sale in 1888, describing
himself as having lived there from 1854, and that he had written a
letter in 1888 directing certain checks to be sent to his bankers, as his
residence was not in "New York, but Westchester."

Petition to revoke probate of will.    Denied.

Johnson, Gallup & Hurry, for petitioners; Horace Barnard,
for respondent.

RANSOM, S.—Section 2476 of the Code of Civil Procedure
provides that the Surrogate's Court of each county shall have
exclusive jurisdiction to take the proofs of wills, when the dece-
dent was, at the time of his death, a resident of that county.
Augustus Zerega died in the city of New York on December 23,
1888. The petition for the probate of his will, filed by his
widow, recited that the testator was "late of the County of New
York;" that he "was, at or immediately prior to his death, a
resident of the County of New York." The paper was verified
in the usual form. In January, 1889, all of the heirs and next
of kin waived the service of a citation, and the execution of the
will was proved by the subscribing witnesses. On February
11th it was admitted to probate, and letters testamentary were
issued to the widow, her eldest daughter, and two of her sons.
On April 22, 1889, six sons and a grandson of the testator and
a legatee named in the will united in a petition to the surrogate,

praying that the decree of probate be revoked, alleging, upon information and belief, that the petition for probate was signed by the widow without reading it, or without a realization of the importance of its contents, and (in substance) that Mr. Barnard, the attorney, had misrepresented to her the purpose of the petition; that the testator was, at the time of his decease, not a resident of the County of New York, but was, and for a period of 35 years had been, a resident of Westchester County, where his family residence was situated; that Mr. Barnard had represented to the various heirs at the time he took the will that he would have it probated in the proper county; that they were ignorant of the law governing such proceedings, and of the proper county for such probate, and that they signed the waivers under the belief that they were in due form of law, and alleging that this court had no jurisdiction to enter the decree admitting the paper to probate. Mr. Barnard is the husband of one of the executrices, and had represented the proponent in proving the will. He put in an answering affidavit, in which he not only denied the statements of the petitioners, but alleged that the testator was and had been a resident of New York since 1863, and set forth other matters pertinent to the subject. This was followed by further affidavits made by the sons, the grandson, and others in support of their petition. After due consideration of the case on all the papers presented, I denied the petition. On appeal, the General Term, in December, 1890, decided that the decree of probate must be reversed. 12 N. Y. Supp. 497. This would seem to be final, and to have ousted this court of jurisdiction; and though the General Term, by an order entered December 29, 1890, did adjudge that the decree of probate was "in all respects reversed," it remitted the proceedings in this court "for further action," but it gave no intimation of the action to be taken. In a memorandum filed June 17, 1891, I called attention to the anomalous situation of the case, and had it placed in the calendar for a hearing on June 23rd. Subsequently, on July 8, 1891, on the consent of the respective attorneys, an order was entered directing E. F. Un-

derhill, Esq., as assistant, to take further evidence, and it is upon the record of proofs reported by him, and the previous papers and proceedings, that the matter now comes before me for decision.

The word "resident," like many others in the language, has varying shades of meaning. In its application to this proceeding it will be considered in its legal sense. In the Century Dictionary it is defined to be "a place where a man's habitation is fixed without any present intention of moving therefrom; a domicile." And "domicile," in the same work, is defined to be "a place where a person has his home, or principal home, or where he has his family residence and personal place of business; that residence from which there is no present intention of moving, or to which there is such intention to return, it depending upon the concurrence of two elements: First, residence in the place, and, second, the intention of the person to make that place his home." Judge GRIER, in White v. Brown, 1 Wall. Jr. 217, says: "It may be correctly said that no one word is more nearly synonymous with the word 'domicile' than the word 'home.'" These definitions reflect the concensus of opinion as expressed by the courts. Though a man may have two residences, he can have but one domicile. Douglas v. Mayor, etc.; 2 Duer, 110; Bell v. Pierce, 51 N. Y. 16. Augustus Zerega, for many years, had two residences. For some time after he came to this country his domicile of choice was the city of New York. From 1854 to 1863 his sole residence was in Westchester, and for that period, certainly, Westchester was his domicile. In 1863 he purchased a house in East Thirty-fifth street, where, for the last 25 years of his life, he maintained a residence in the city of New York. In Dupuy v. Wurtz, 53 N. Y. 561, the court held that, to effect a change of domicile, there must be both residence in the alleged adopted domicile and intention to adopt such place of residence as the sole domicile; that residence alone had no effect, *per se*, though it might be most important as a ground from which to infer intention; that length of residence would not alone effect a change, and

intention alone would not do it, but the two taken together constituted a change of domicile. Did Mr. Zerega, when he acquired a residence in this city, which he occupied the greater portion of each of the 25 years preceding his death, or at any time subsequently, elect to make it his domicile, and to look upon his Westchester house as a country residence? On the *ex parte* affidavits of the petitioners and others sustaining their contention, and the answering affidavit of Mr. Barnard, I held that he did. On the same evidence, the General Term decided that he did not, and that his stays in New York were only temporary. Many of the facts assumed by the appellate court as the ground for its decision have been shown by the proofs taken in this proceeding, in which there was an opportunity to cross-examine the affiants, and by other evidence, to have been largely without foundation.

To sustain their contention, the petitioners rely mainly upon the oral and the written declarations of the testator, the fact that he paid taxes on his personal property in Westchester County, and the assumption that he voted there. The oral statements extend over a period of 25 years, and for the most part are testified to by the petitioners. Their value as an aid in determining the question of domicile depends upon whether they have been accurately restated by the witnesses, and upon the credit to be given to their testimony. In this proceeding the hostility to Mr. Barnard of the petitioners who appeared as witnesses before the assistant was not disguised. The statements made in their affidavits, perhaps without due consideration, became extravagant and reckless under the cross-examination by Mr. Barnard, which was conducted in no amiable spirit, and it is apparent that at times bias and personal feeling caused them to exaggerate, if not to distort, the language of the testator. Nor can I trust the accuracy of their memories, covering a period of many years, in some instances, after the words were uttered. Still I have no doubt that the testator did, in words or in substance, after he had acquired a residence in New York, say that he "lived in Westchester;" that he had his "home" or

his "residence" there; that he had "lived there 35 years;" and that he used other similar expressions. The circumstances under and the spirit in which he made the statements are not disclosed; and if he ever spoke of being a "citizen" of Westchester, as stated by one witness, it is not shown whether it was before or after he bought the house in New York. Words are not used by laymen with the precision which lawmakers and courts aim to employ. Even in legal enactments, in which the words "resident" and "residence" are used, the courts have often been invoked to interpret their meaning as applied to particular cases. The word "domicile" (which was used in the earlier decisions in this State) has not been traced in this case to the testator's lips. If he had used it, it is doubtful whether he, a man of business, would have understood the refined distinction between it and words of similar, though not exactly the same, import. Westchester County had been his domicile, certainly, until 1863. From that time until his death it continued to be his residence for five months in the year. The words attributed to him are not inconsistent with the formation of a purpose, at some period during the 25 years preceding his death, to make New York his domicile. Akin to these statements of the testator are declarations attributed to him that he had purchased the house in Thirty-fifth street for his daughter (who was about to marry Mr. Barnard) to live in; that, as he had bought the house, he might as well have the benefit of it; that he visited his daughter in winter; that he thought it would be better to help her pay the expenses of the table, etc. The language attributed to the testator in this regard cannot be accepted as evidence of facts, and any presumption claimed to arise from it may be rebutted by trustworthy proofs that it is untrue. The circumstances under which the language was used are not shown—whether in a petulant mood, in a spirit of fault-finding, or whether it was deliberately uttered.

With written declarations the liability to a distortion of language is lessened, and if the paper is all in the handwriting of the party it is not open to suspicion. But the value of written

declarations as evidence depends upon the circumstances under which they were made—whether care was taken to have the paper read to the party, if only the signature is in his hand-writing, and whether his mind grasped the legal import of the words used, if the language in the paper was not his own. In the words of Surrogate Bradford (Isham v. Gibbons, 1 Bradf. Sur. 91), "written declarations, even of the most solemn char-acter, are but facts to enable the court to discover the intention of the party. It is in this light alone that they are to be re-ceived and weighed. At best, the animus of the party is only to be inferred from them. In this respect they are taken like any other facts. Declarations of any kind are not controlling, but may be, and frequently are, overcome by other and more reliable indications of the true intention." So, in Attorney General v. Kent, 1 Hurl. & C. 12, though the judges held that jurisdiction was in the English courts, they stated that the de-claration in the will that the decedent was "residing in the County of Surrey" was entitled to vary little consideration. And in Gilman v. Gilman, 52 Me. 165, it was held, though the testator described himself as "of the city and State of New York," that the recital could not weigh against facts which led to the conclusion that his domicile continued at Waterville, in the State of Maine. In Hegeman v. Fox, 31 Barb. 478, refer-ring to both oral and written declarations, the court (Judge EMOTT writing the opinion) says: "To the evidence of what he said at various times, I attach little importance. It comes to us impressed with the character of the particular mood of the man when he uttered it, which, no doubt, varied and was affected by the condition of his health, by his family circum-stances, and by other causes. It is colored more or less by the medium through which it comes, and it depends altogether upon the recollection of witnesses; nor do I consider the statement in Mr. Moore's bill in chancery that he was an inhabitant of Flor-ida, standing alone, as at all decisive. It was necessary for him to make such an allegation for the purpose of his suit, and he might very well have made it without fully considering its im-

port or its extent or its consequences in other relations. Coupled, however, with his conduct, it is evidence which may disclose another motive for a wish, on his part, to acquire a residence in Florida, at or after the time when he settled near Jacksonville. * * * But the whole matter is a question of intention, and no arbitrary rule is to be laid down in relation to it." And in Dupuy v. Wurtz, 53 N. Y. 562, it is laid down as a rule that "courts must draw their conclusions of intention to change a domicile from all the circumstances in each case."

The written declarations relied upon by the petitioners are: First. The will of 1872 (executed nine years after the testator had acquired a residence in New York), in which he declared himself as of the town and County of Westchester. The paper was drafted by Mr. Barnard, who claims that from early in December, 1863, the testator had been domiciled in the house in East Thirty-fifth street. Mr. Barnard's explanation for inserting a recital which he claims was untrue, is, "if he gave the matter any thought," that it was "to please the vanity of other members of the family, who thought themselves dignified by their father owning a country residence," though he states he had no conference with them about the will. The explanation is a suggested possibility, and is unworthy of consideration. The paper was copied by the testator, and executed, and I see nothing to discredit the recital of his place of residence in 1872 as equivalent to a domicile. Second. A paper written by testator in 1886, and delivered to Mr. Pelham Clinton, in which he sets forth the wholesomeness of his Westchester place, as evidenced by the fact that he, at 83, and his wife at 77, had lived there since 1854, with a large family of children and grandchildren, with but one death. But the avowed purpose of writing the article was for Mr. Clinton to procure its publication in the newspapers as a means of reaching a purchaser for the place. The statement was, to say the least, disingenuous, for it is shown that for 25 of the 35 years he had passed only five months in each year on his Westchester property; and, as the

paper was written in the month of November, it was probably prepared in his New York house. Third. A letter of the testator to the gas company, written in May, 1888, while he was still in his Thirty-fifth street house, directing that the checks for dividend on his stock be sent to Hallgarten & Co., who were his bankers, and "not to 26 East Thirty-fifth street," stating that his residence was "not in New York, but Westchester.". The two dividends which followed—June 15th and December 15th— were sent to his bankers, as requested. A few days after the last dividend he died. The purpose of the letter is evident—to avoid the necessity of having checks remailed to him from East Thirty-fifth street to Westchester, to be then forwarded to Hallgarten & Co. The language seems to import that he had had trouble in this respect in previous years. In the statement written for Mr. Clinton he used the word "living;" in the letter to the gas company, the word "residence." He and his family had "lived," and were still living a part of the year in Westchester, and at the time he wrote to the gas company his "residence" was, and for 25 years had been, during seven months in the year, in East Thirty-fifth street. Whether that was his domicile I will consider hereafter. But in neither case were the circumstances under which the words were used such as to lead him to carefully weigh their technical significance. Fourth. The will of 1885, in the testator's handwriting, in which he again describes himself as "of the town and County of Westchester." The paper had been drafted by Mr. Barnard, he using the language of the will of 1872, except where its provisions were to be modified, and, if Mr. Barnard's testimony is to be credited, with the understanding that the testator would go over it with him before its execution. It was not done, however, and the instrument recites him as of Westchester.

In this connection I may refer to written declarations of the testator which tend to show the recognition by him of a domicile in New York. In September, 1876, he, as executor, propounded the will of his late partner, Mr. Bernier, for probate, and in the petition, duly verified, he described himself as of the city

of New York, and in qualifying as executor in December following he said: "I am a resident of No. 26 East Thirty-fifth street, in the city of New York." I see no reason for the statement in the brief and argument of the petitioner's counsel that Mr. Barnard, who was the attorney in that proceeding, had "entrapped" the testator into making these declarations, for the words filled in the blank form of deposition do not seem to be in Mr. Barnard's handwriting. They were probably inserted by a clerk of this court at the probate desk, and, as is the rule, were read by the affiant, or they were read to him before his signature was affixed. It is most improbable that a painstaking, careful and conservative business man, as this testator is shown to have been, would swear to a paper without knowing its contents, though, as I have previously stated, it may be doubted whether he considered the legal significance of the word "resident." Then, on December 12, 1887, he wrote from 26 East Thirty-fifth street a recommendation for Patrick Smith, who had been in his employment for six years, stating that if he was ever in want of a gardener on his "country place" he would take him as such. To the same effect are certain oral declarations. To Mr. McRae, who was negotiating a sale of the property, he spoke of the Westchester house as his "country seat" or "country place." To Mr. Barnard he used similar language. Even George T. Zerega, the most active petitioner in this proceeding, testifies that his father bought the New York house, and "intended to live in it." The petitioners claim as evidence of the continuance of the testator's domicile in Westchester the fact that he was assessed for and paid taxes on his personal property there. It was admitted on the trial that he did pay such taxes from 1856 to the time of his death "upon the personal property which was actually located at his country place in Westchester." With personalty at his death worth from $350,000 to $400,000, it was his good fortune that the authorities in Westchester laid his tax at only $10,000, when his sole residence was in that county. If he did change his domicile to New York, he was very willing that the assessors in Westchester should still look

upon him as a resident there, rather than invite scrutiny by the New York authorities into his means, with a disclosure that would lead to a large increase of the amount of the taxes. In Douglas v. Mayor, etc., *supra,* the plaintiff was taxed for his personal property in this city, though his domicile was on Long Island, and he occupied a hired house in New York during the winter and spring months only. So in Bell v. Pierce, *supra,* the plaintiff's place of business and domicile were in Buffalo, but he was taxed on his personal property in West Seneca—his summer residence—where he and his family were at the time the taxes were laid. In each case, the party resisted the attempt to collect taxes in a place which was not his domicile, and in each the court decided against him. So in this case, the payment of taxes cannot fix the domicile of the testator in Westchester, if the facts proven point to a different conclusion.

In their affidavits the petitioners swore that they knew "of their own knowledge" that the decedent voted in the County of Westchester. The General Term seems to have laid much stress on this as a fact abundantly proven. But when the affiants were produced for cross-examination in this proceeding, their positive statements were found to be based on the merest hearsay. John A. Zerega testified that the testator told him "twenty times—yes, a hundred times—that he had voted." Another son, Alfred, stated that the testator drove with him to the polls. He thinks they started from his father's house (probably the Westchester house), the testator stating that he was going to vote for his old friend Watson for supervisor, and that at the polls he saw his father talking with others. He stated the time as the second election of President Lincoln. This would have been in 1864, and Alfred says that he himself then voted for Mr. Lincoln. The worthlessness of his testimony in respect of time is shown by the fact that the town meetings at which supervisors were elected were, by law, directed to be held between the 1st of February and the 1st of May in each year (Laws 1839, ch. 389, sec. 2), and this was the law in 1864. Alfred says that while in the carriage the testator said that he had never voted

but once, and would not vote except for Mr. Watson. There is no evidence in the case to show when Mr. Watson was a candidate for a town office. If in the spring of 1863, or antecedent thereto, it was before the removal of the family to the Thirty-fifth street house, when he was still living in his country place, and hence reflects no light on the question of a change of domicile in December, 1863, or thereafter. If in 1864, it was when he was actually living in the Thirty-fifth street house, whether in the spring or fall; and his daughter, Mrs. Barnard, testifies that he never left the city to vote in Westchester. There is no evidence suggesting that he voted for a town officer after 1864. But the decisive fact is the certificate of the town clerk of Westchester, which shows that the poll lists from 1863 to 1882 (except those of 1872 and 1877, which were not found among the papers in his office) do not contain the name of the testator. Hence, when he did vote in Westchester, if ever, it was prior to the election of November, 1863. Nor does the fact that the testator's name appears on the registry lists of 1863, 1864, 1865, 1867, 1868 and 1869 (1866 not being reported by the town clerk) raise any presumption of a purpose to vote after 1863, especially in view of his indifference to the exercise of the right of suffrage apparent from the proofs. By the act of 1865 (chapter 740), the registry lists were made up from the poll lists of the previous elections, to which no name could be added except upon the application of a person appearing before the board. It strains one credulity to believe that, year after year, a man would apply to be registered in Westchester when he had no intention of voting. I have not been able to find the statute providing for the registry of voters preceding 1865. When it is considered that the petitioners had scarce any foundation for a belief, not to say knowledge, that the testator had voted in Westchester, if the fact does not raise a suspicion of the honesty of their statements, it certainly makes them valueless as a support of their contention.

Another fact which the petitioners claim is evidence that the testator's stays in New York were annual visits, and that his

domicile continued in Westchester, is that, whereas, in their country residence, he and his wife occupied opposite ends of the table at meals, in New York Mr. and Mrs. Barnard held those positions, and the parents sat at their daughter's side. But, as they had reared a large family, and were advancing in years, it was natural that each should wish to be relieved from unnecessary cares, and, with a daughter and son-in-law a part of their family, to let them act in their stead.

The effort of the petitioners to place the testator and his family in the attitude of boarders with Mr. and Mrs. Barnard has utterly failed. The allegations in their *ex parte* affidavits that he "was in the habit of boarding in New York for a part of the year;" that "he paid a certain sum monthly for his expenses;" and (as testified by one petitioner) that he boarded with Mrs. Barnard (which Mr. and Mrs. Barnard deny), and paid an extravagant price therefor—and other similar declarations, have been disproved by the evidence. The testimony of Mrs. Barnard is that when the testator and his family moved into the Thirty-fifth street house, he directed her to take charge, enjoined her to be economical in its conduct, to bring him the bills for household expenses, which she did, and he gave her the money to pay them. This continued for two or three years, until he began to give checks to the order of Mr. Barnard, Mrs. Barnard not wishing to open a bank account. The checks were passed to Mr. Barnard's credit in the bank in which he kept an account, and from time to time, he drew his own checks to meet the expenses of the household, including the wages of the servants (except the nurse employed by Mrs. Barnard), and many other disbursements for members of the testator's family. The testator's checks, as appears from the testimony, were given by him to his wife, who passed them over to Mrs. Barnard. The account books kept of the expenses of the household were each month audited by the testator, and to each footing he added a memorandum in his own handwriting, "Entered." This fact admits of no reasonable conclusion other than that he controlled the house, paid its expenses, and that to Mr. and Mrs. Barnard

were given the cares of the housekeeping, from which he and his wife wished to be relieved; and that, for their services, the daughter and son-in-law received their sustenance as members of his family. The only foundation for the claim that the testator and his family "boarded" with Mr. and Mrs. Barnard is the language attributed to him by the petitioners. With their animus towards Mr. Barnard, the force of his words, in all probability, was exaggerated. But, admitting that they substantially reproduced his declarations, they cannot weigh against the evidence that the testator was the head of the household; that his will controlled its management; that at any moment he could have displaced Mr. and Mrs. Barnard, and he and his wife resumed the cares which they had delegated to them.

The testimony of one of the petitioners that, until the will was read, he had always supposed the Thirty-fifth street house was Mrs. Barnard's; that it was always spoken of as her house, and when he visited it, he believed it was by her invitation, and that he was her guest—is not worthy of consideration. Repute and belief cannot establish a domicile, much less pass title to real estate. As reflecting on the credence to be given to the petitioners' statements is the allegation in their *ex parte* affidavits, that during the testator's stays in New York his residence in Westchester "was in charge of six servants." One would infer from this language that six of his house servants were left in the Westchester residence, whereas, for several years after his family came to New York in November it was closed, and left closed until they came back in June. A burglary on the premises caused the testator to have a room fitted up for two farm hands to occupy at night as a precaution against further depredations.

A brief statement of the testator's career as bearing on the probabilities of his having resumed his domicile in New York may be stated. He was a foreigner by birth, and no evidence of his naturalization has been found, after careful search, in the records of the courts of this city. According to his own statement, he did vote for a candidate for mayor of New York

nearly a half century ago, when he was living at an hotel. He afterwards purchased a house on Fifth avenue, where he lived with his family until 1854, when he sold it, and purchased the property in Westchester, to which they removed. He then retired from active life, the business being carried on by his partners—Mr. Bernier and his eldest son. For several years he did not leave his country residence. With sons grown up, and the cares of a large country place, he found life less congenial than when he resided in the city, and, as early as 1860, he expressed a desire to sell the property. Each fortnight he visited the city and remained at an hotel for two or three days. In 1863 his eldest daughter had become engaged to Mr. Barnard, then a young attorney, whose sphere of professional work was to be in New York. This afforded him an opportunity to return to the city. In May of that year he negotiated the purchase of the house and furniture on East Thirty-fifth street. He brought his wife and two daughters to the city, took them through the house, and, as it pleased them, he concluded to buy it. He allotted the various apartments to the different members of the household, except the rooms which he intended for Mrs. Barnard and her husband. The negotiation and the allotment of the rooms were without the knowledge of Mr. Barnard, who, when the matter was broached to him, objected, but he at length acquiesced in the arrangement. A contract of purchase was signed, and on June 2, 1863, title was passed, and the testator took possession of the property, and left it in charge of a servant of its former owner. The marriage of his daughter took place July 30th. After several weeks passed on their wedding tour, Mr. and Mrs. Barnard went to the testator's house in Westchester, where they remained for a time. In October they came to the New York house. During the months of October and November the testator and his partner, Mr. Bernier, occasionally slept in it. He purchased additional furniture especially for his own apartments. In December he came to the house, bringing his wife, two married daughters, a son, a grandson, his wife's mother, and a retinue of servants from Westchester. He brought also

his bed and table linen and plate. He caused to be built an additional room for a man-servant. He exercised all the rights of the head of the house of which, with the most of the contents, he was the owner. He gave orders that certain parties objectionable to him be not invited to visit the house. When Mrs. Barnard was ill or absent, her sister occupied her place. This occupancy of the house by the testator and his family continued the first year from December, 1863, until May, 1864, and afterwards from November 1st to June 1st, when he and his family and servants left for Westchester. This practice continued each year until late in December, 1888, when they returned to Thirty-fifth street. On the 23rd of that month testator died. From there he was buried. A death notice, stating that as his residence, was published in the newspapers, with the knowledge of his eldest son, one of the petitioners who seek the revocation of the probate of his will in this county. From the Thirty-fifth street house the testator's second daughter was married. In it he and his wife celebrated their golden wedding. There his wife's mother died, and from that house her funeral took place. For a time after taking possession of the Thirty-fifth street house the testator had an office in New street, with his partner, Mr. Bernier. After Berneir's death, he made his headquarters in the office of Hallgarten & Co., his bankers, who fitted up a portion of it for his use. His custom was to visit it daily, and whatever business he did in the way of looking after investments was done by him there. For nearly 30 years he had been anxious to sell his Westchester property. The last year of his life he said he would never put his foot on the place again. Whether, at the beginning of his stays in the city, his intention was to abandon his domicile in Westchester, and fix it in his New York residence, may be doubtful. But there came a time, I am convinced, when it was determined upon, and it first found a fixed expression, as the evidence discloses, in 1876, in the petition for the probate of and his qualification as executor under Mr. Bernier's will, in each of which papers he describes himself as of the city of New York. On all the facts

known to Mr. Barnard at the testator's death, as they have been disclosed by the evidence, he, as the attorney of the testator during his life, and of the widow in the proceeding to prove his will, was justified in assuming that this court had jurisdiction. It is a noticeable fact that neither the widow nor the daughters of the testator joined the petitioners in this proceeding. It could not be expected of Mrs. Barnard, when the good faith of her husband had been called in question. But if the allegations of the petitioners were true, and either the ends of justice or the interests of the heirs demanded, it is probable that the widow and her daughters, Mrs. Huntington and Miss Zerega, would have made supporting affidavits. Strenuous efforts were made by one son, certainly, to get his mother to swear to an affidavit, which she refused to do, because she found its recitals were untrue; and when it was modified she still declined to affix her signature. The only certain declaration of the widow which seems to favor the petitioners' contention is in a recent letter, in which she states that Mr. Barnard "knew in his heart that he was wrong, but had not the manliness to acknowledge it." This statement, however, was made in a correspondence with the son who has been most active in prosecuting this proceeding. But the conclusion of an old lady on an issue involving a technical definition has no significance in arriving at a decision of the case. That deception was practiced upon the widow by Mr. Barnard in procuring the verification of the petition for probate I do not believe. And it is incredible that the several petitioners who seek its revocation should have been imposed upon by him when they executed waivers of the service of the citation; and when the two sons qualified as executors, after probate, they raised no objection. Their antipathy to Mr. Barnard, if it had not already existed, was aroused when he suggested that debts due by some of the sons to the testator be included in the executor's inventory of the estate. They objected, and when they found that he was not tractable, the feeling on the part of some of the heirs became bitter. This was shown in the oral examin-

tion of those produced, and that the feeling was heartily reciprocated by Mr. Barnard is manifest.    One witness I do credit with a sincere purpose to tell the absolute truth without reserve. I refer to Mrs. Barnard.    Her testimony shows that the motive of the petitioners in beginning the proceeding was to avoid taxation of the estate in this city.    It also shows their unfilial efforts to secure the active co-operation of their mother to carry out the scheme.   The result has been more than three years of litigation, in which bad blood has been engendered and expense unnecessarily incurred.    I can see no motive for Mr. Barnard desiring to prove the will in this court if the domicile of the testator was in Westchester.    If it was not, I can see every reason why it should be proved here, where a large portion of the estate is, and where nearly all the heirs reside.    As a result of a thorough examination of the whole case, I must deny the petition to revoke probate, and I will sign a decree accordingly.

(Note.—Aff'd by Gen. Term, without opinion, 76 Hun, 611.)

(Note as to law of domicil:)

DEFINITION.— GENERAL  OBSERVATION.— LEADING  RULE.—
WHEN A NEW DOMICIL IS ACQUIRED.—WHEN A NEW
DOMICIL IS NOT ACQUIRED.—DEGREE OF PROOF.—DOMI
CIL OF WARD.

### DEFINITION.

Domicil is defined as "that place where a man has his true fixed and permanent home and principal establishment, and to which whenever he is absent he has the intention of returning." (Raine's Bouvier's Law Dictionary, 600, citing 10 Mass. 188; 11 La. 175; 5 Metc. 187; 4 Barb. 505; Wall. Jr. 217; 9 Ired. 99; 1 Tex. 673; 13 Me. 255; 27 Miss. 704; 1 Bos. 673; 74 Ill. 312.)

### GENERAL OBSERVATION.

There are three kinds of domicil: Domicil of origin, domicil by choice, and domicil by operation of law.    (Smith v. Croom, 7 Flor. 151; Story's Con. L. 48-9.)

This note will be confined to a consideration of that subdivision of the second kind, viz., domicil by choice, which is

known as "domicil of succession," which is defined in Smith v. Croom, 7 Flor. 151, as "the actual residence of a man, within some particular jurisdiction, of such a character as shall, in accordance with certain well established principles of public law, give direction to the succession to his personal estate," and will also include cases where the domicil of a decedent who has resided in different counties of the State comes in question.

The leading New York case on the subject is Dupuy v. Wurtz, 53 N. Y. 561, in which it was held that to effect a change of domicil for the purposes of succession, there must not be only a change of residence, but an intention to abandon the former domicil and acquire another as the sole domicil. There must be both residence in the alleged adopted domicil, and intention to adopt such place of residence as the sole domicil. Residence alone has no effect *per se,* though it may be most important as a ground from which to infer intention. Length of residence will not alone effect the change. Intention alone will not do it, but the two, taken together, do constitute a change of domicil— citing Hodgson v. DeBeauchesne, 12 Moore, P. C. Cases, 283, 328; Munro v. Munro, 7 Cl. & F. 877; Collier v. Rivas, 2 Curties, 857; Aikman v. Aikman, 3 McQueen, 855, 877. This rule is laid down with great clearness in the case of Moorhouse v. Lord (10 H. L. 283, 292) as follows: Change of residence alone, however long continued, does not effect a change of domicil as regulating the testamentary acts of the individual. It may be and is strong evidence of an intention to change the domicil. But unless in addition to residence there is an intention to change the domicil, no change of domicil is made. And in Whicker v. Hume (7 H. L. 139), it is said the length of time is an ingredient of domicil. It is of little value if not united to intention, and is nothing if contradicted by intention. And in Aikman v. Aikman (3 McQueen, 877), Lord Cranworth says, with great conciseness, that the rule of law is perfectly settled that every man's domicil of origin is presumed to continue until he has acquired another sole domicil with the intention of abandoning his domicil of origin; that this change must be *animo et facto,* and the burden of proof unquestionably lies upon the party who asserts the change.

## LEADING RULE.

The leading rule is that, for the purposes of succession, every person must have a domicil somewhere, and can have but one

domicil, and that the domicil of origin is presumed to continue until a new one is acquired. (Same case, citing Somerville v. Somerville, 5 Ves. 750, 786, 787; Story, Conf. Laws, sec. 45; Abington v. N. Bridgwater, 23 Pick. 170; Graham v. Public Ad., 4 Brad. 128; DeBonneval v. DeBonneval, 1 Curtis, 856; Attorney General v. Countess of Wahlstatt, 3 Hurl. & Colt, 374; Aikman v. Aikman, 3 McQueen, 855, 863, 877.)

## When a New Domicil is Acquired.

When a testator purchased an expensive house in New Haven, where he said he would live and die, and that he would never live in New York again except for a few days, and soon afterwards died, *held,* that his domicil was in New Haven, although he previously spent the winters in New York and the summers in New Haven, and was described in his will as of the city of New York. (Petersen v. Chemical Bank, 32 N. Y. 21, aff'g 27 How. Pr. 491.)

A testator who was in ill health left Brooklyn for Florida, stating that he could not stand the climate of the north, and that he never expected to return. *Held,* that as he had sold his house and furniture in Brooklyn, and closed up his business there, his domicil was in Florida, where he purchased a plantation, and where he died within two years subsequently, and his wife was entitled to one-third of his personal estate according to the law of Florida. (Hegeman v. Fox, 1 Red. 297; aff'd 31 Barb. 475.)

A testator was held to be domiciled in New York, although he had described himself in his will and in a trust deed as of the State of New Jersey, in which State he died, and had a residence, when he also had a residence in New York County, where he resided the greater portion of his time, and where he voted and held official positions, and that therefore a provision of his will was invalid under the laws of this State as violating the statute of perpetuities, although valid according to the laws of the State of New Jersey. (Mackenzie v. Mackenzie, 3 Misc. 200, 23 N. Y. Supp. 270.)

Intestate, a resident of New York City, having become mentally unsound, was removed to Oneida County in 1894, where he resided till his death in 1897, except for a short residence in Connecticut. A committee of his person and estate was appointed by the Supreme Court of Oneida County. *Held,* that decedent's residence at his death was in Oneida County, and

that the New York Surrogate's Court had no power to issue letters of administration to his estate. (Matter of Hyland, 24 Misc. 357, 53 N. Y. Supp. [87 St. Rep.] 717.)

## When a New Domicil is Not Acquired.

The word "resident" in the statute authorizing the reception of a foreign probate in the case of a will made by a non-resident in this State, does not mean an actual, naked residence, but a permanent and fixed abode, and is synonymous with the words "inhabitant" and "domicil." (Isham v. Gibbons, 1 Brad. 69, in which case it appeared that testator, who had lived in and had a dwelling in New Jersey, came to New York to consult a physician, and rented a house where he died after two years' occupancy. All the evidence showed that his residence in New York was merely for the convenience of seeing his physician, and that he intended to return to New Jersey. *Held,* that his domicil was in New Jersey, and an exemplification of the probate of his will in that State should be recognized as valid here.

An intestate on her way from Scotland, her domicil of origin, to Canada West, died at Staten Island. *Held,* that as she had not lost her domicil of origin, mere intention to change not being sufficient without actual residence in the intended domicil, her estate should be distributed according to the law of Scotland. (Graham v. Public Administrator, 4 Brad. 127.)

A testator who was born in and resided in the city of New York till her marriage went with her husband to live in Philadelphia, where she resided with him for thirteen years, when they separated, the husband making his home in Philadelphia, and she, with three children, in New York, where she lived with them till a short time prior to her death, which occurred in Europe. She supported her children out of property left her, and which she bequeathed to them by her will. *Held,* that as since the passing of the Married Women's Acts the rule that a woman acquires the domicil of her husband and changes it with him, no longer prevails, and she may acquire a separate domicil of her own, the domicil of the wife was in New York City, and not Philadelphia. (Matter of Florence, 27 St. Rep. 312, 54 Hun, 328, 7 N. Y. Supp. 578.

Declarations of a change of residence, or of intent to do so, are not sufficient to show such change; there must also be proof of facts showing an actual change. (Matter of Clarke, 40 St.

Rep. 12, in which case it was held intestate had not changed his residence from Otsego County to Herkimer County.)

In Cruger v. Phelps, 21 Misc. 252, 47 N. Y. Supp. (81 St. Rep.) 61, it was held that although a testator had resided for many years in different parts of Europe, he did so on account of his wife's and daughter's health, and as he had in his will and many other documents described himself as of the city of New York, and as his property was almost entirely in this country, he had never lost his domicil here, and his will should be construed according to the laws of this State.

A testator came to New York City in March, 1894. His residence had been previously at Piermont, Rockland County. He boarded in New York City till 15th of March, 1895, at the expense of his wife, who would not tolerate his intemperate habits, but who was willing again to live with him if he reformed. As he did not do so, his wife brought an action for separation in April, 1895, at which time testator went to New Jersey and thence to Rockland County, where he died in October, 1895. Although a will, not holographic, made by him in April, 1895, described him as residing in the city of New York, his attorney who drew the will was not particularly instructed to so describe him, nor was testator's attention particularly called thereto, although he compared the will with a rough draft thereof. On the other hand, two assignments of a trust fund executed by decedent at the same time, and two affidavits verified by testator, described testator as of Piermont, New York, the affidavits further alleging that Piermont was his permanent residence. *Held,* that testator's residence for the purpose of jurisdiction on his estate, was Piermont, and not New York City. (Matter of Brant, 30 Misc. 14, 62 N. Y. Supp. [96 St. Rep.] 997, citing Dupuy v. Wurtz, 53 N. Y. 556; Hart v. Kip, 148 N. Y. 306, 42 N. E. 712; *In re* Stover, 4 Red. Sur. 82, 85.)

Although testatrix lived continuously in France and Switzerland and in traveling in Europe from 1865 till her death in France in 1897, except for one year (1878-9), when she came to New York, *held*, that as she had not intentionally relinquished her residence in New York State, the court here had jurisdiction to admit her will (executed in accordance with the laws of this State) to probate, notwithstanding her lengthened residence abroad. (Matter of Cleveland, 28 Misc. 269, 59 N. Y. Supp. [93 St. Rep.] 985.)

## DEGREE OF PROOF.

It was held in Cruger v. Phelps, 21 Misc. 252, 47 N. Y. Supp. (81 St. Rep.) 61, that a change of domicil to a foreign country should only be established by the clearest proof, especially when the property interests and the residence of the beneficiaries, etc., are in this State.

## DOMICIL OF A WARD.

When a testator domiciled in Connecticut directed that his daughter should, after his death and during her minority, reside in New York under the care of her guardian there, *held,* that although the daughter, after residing for some time in New York with her guardian, died in Connecticut, where she was at school, her domicil was in New York. (Matter of Howard, 52 Barb. 294.)

Although a mother, after the father's death, may change her children's domicil, she loses this right when she marries again. (Brown v. Lynch, 2 Brad. 214.)